**VELAZQUEZ v. PEOPLE OF PUERTO RICO.**

No. 2923.

Circuit Court of Appeals, First Circuit.

April 12, 1935.

MORTON, Circuit Judge, dissenting.

---

P. Albizu Campos, of San Juan, P. R., for appellant.

William Cattron Rigby, of Washington, D. C. (Benjamin J. Horton, Atty. Gen., and Nathan R. Margold, Solicitor for Depart-

ment of the Interior, of Washington, D. C., of counsel), for the People of Puerto Rico.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

BINGHAM, Circuit Judge.

This is an appeal from a judgment of the Supreme Court of Puerto Rico affirming a judgment of the District Court of San Juan sentencing the defendant, appellant, to a year imprisonment and the payment of costs; it having found him guilty of the crime of aggravated assault and battery. The assault was committed upon the person of the Chief Justice of the Supreme Court of Puerto Rico while in his private office on the second floor of the Santo Domingo Barracks. This building is located in the city of San Juan, and on the second floor are also rooms used by the Supreme Court and the District Courts of San Juan for court purposes.

The prosecution was had under the Puerto Rican statute of March 10, 1904 (Revised Statutes and Codes of Porto Rico, p. 908), sections 6 and 8 of which provide:

"(5664) Sec. 6. An assault and battery becomes aggravated when committed under any of the following circumstances:

"1. When committed upon an officer in the lawful discharge of the duties of his office, if it was known or declared to the offender that the person assaulted was an officer discharging an official duty;

"2. When committed in a court of justice, or in any place of religious worship, or in any place where persons are assembled for the purpose of innocent amusement. * * *"

"(5666) Sec. 8. The punishment for an aggravated assault, or aggravated assault and battery, shall be a fine of not less than fifty nor more than one thousand dollars, or imprisonment in jail not less than one month nor more than two years, or by both such fine and imprisonment."

The chief contention of the defendant appellant is that the place where the assault occurred was under the exclusive jurisdiction of the United States; that the alleged assault, if a violation of law, was a violation of the laws of the United States, and that the local courts of Puerto Rico had no jurisdiction over crimes or offenses committed in that place.

Although this question was raised for the first time in the Supreme Court, that court entertained the question and held that the insular laws, not the laws of the United States, applied; that the insular courts had jurisdiction; and affirmed the conviction. In so doing it took judicial notice of the acts of Congress, the acts of the Puerto Rican Legislature, the decisions of its courts, and of one in the federal District Court of Puerto Rico in the case of United States v. Iglesias, 13 Porto Rico Fed. Rep. 282, where, in the opinion of the court, is a careful statement of facts relating to the question. That case was decided January 23, 1924. The crime there charged was murder committed in the same building. There was then and is now a stairway leading from the ground floor to the second floor of the building where the Supreme Court and the District Courts are held. The accused was on the stairway and his victim was ascending it and fell in the hallway at the head of the stairs upon being shot. He was indicted in the insular District Court of San Juan and also in the federal District Court. In that case the defendant was represented by counsel, the United States District Attorney and a member of the Judge Advocate's Department of the United States Army represented the United States, and the people of Puerto Rico appeared as amicus curiæ by its Attorney General and Assistant Attorney General. On the facts there agreed upon (of which no doubt the Supreme Court of Puerto Rico in the instant case took judicial notice), the federal District Court held that the United States had the exclusive jurisdiction over the place and the crime there committed, and that the offense charged was one to be heard and determined by that court.

It is evident from this conflict of authority between the local and federal courts of the Island that the question involved is one of importance and should now be set at rest.

The building in question, long known as the Santo Domingo Barracks, was in existence on the 10th day of December, 1898, when the Treaty of Paris was entered into by which the government of Spain ceded to the United States the Island of Porto Rico and certain adjacent islands, and comprised a part of the property then ceded to the United States. Before that it had been occupied by the Spanish authorities as a public building. The Spanish Territorial Court, the Audiencia Territorial, and other courts of that period were held there and in substantially the same quarters now occupied by the Island courts. Prior to the

cession of the Island by Spain, the United States, through its military authorities, on or about August 12, 1898, took possession of this building and other public buildings and property and used them as instrumentalities of the federal government. Civil courts were established for the Island under General Orders issued by the military authorities of the United States; and these courts, at the sufferance of the military authorities, occupied the same quarters. The ground floor was and is now occupied by the military authorities.

By the Act of Congress of April 12, 1900 (31 Stat. 77) known as the Foraker Act, Congress established a government for the Island of Porto Rico and the adjacent islands of a territorial nature and vested judicial power in the courts and tribunals previously established by the military orders. The only change in the courts made by this act was the establishment of a federal District Court to take the place of the United States provisional court previously established under military orders. This act made no provision for court quarters in San Juan or the other places where the courts were to be held.

From the time this building was taken over by the military authorities in August, 1898, it remained under the control of the federal government down to as late as July 1, 1902, if not later, as did all the other property acquired from Spain, except to the extent that such other property, after the establishment of the insular government on May 1, 1900, may have become subject to the temporary control of that government under section 13 of the Act of Congress of April 12, 1900 (48 USCA § 747 note). On July 1, 1902, Congress passed an act entitled, "An Act Authorizing the President to reserve public lands and buildings in the island of Porto Rico for public uses, and granting other public lands and buildings to the government of Porto Rico, and for other purposes," section 1 (32 Stat. 731, see 48 USCA § 746) of which reads as follows:

"That the President be, and he is hereby, authorized to make, within one year after the approval of this Act, such reservation of public lands and buildings belonging to the United States in the island of Porto Rico, for military, naval, light-house, marine-hospital, post-offices, custom-houses, United States courts, and other public purposes, as he may deem necessary, and all the public lands and buildings, not including harbor areas and navigable streams and

bodies of water and the submerged lands underlying the same, owned by the United States in said island and not so reserved be, and the same are hereby, granted to the government of Porto Rico, to be held or disposed of for the use and benefit of the people of said island: *Provided,* That said grant is upon the express condition that the government of Porto Rico, by proper authority, release to the United States any interest or claim it may have in or upon the lands or buildings reserved by the President under the provisions of this Act: *And provided further,* That nothing herein contained shall be so construed as to affect any legal or equitable rights acquired by the government of Porto Rico or by any other party, under any contract, lease, or license made by the United States authorities prior to the first day of May, nineteen hundred."

It appears in the opinion of the Supreme Court in this case, and in the opinion in the Iglesias Case, that, pursuant to the power given by the Act of July 1, 1902, and within one year thereof, the President, in June, 1903, reserved for military purposes certain lands with the buildings thereon, including the Santo Domingo Barracks. See, also, Roman Catholic Church v. People of Porto Rico, 11 Porto Rico at pages 488, 489.

February 16, 1903, the Legislature of Porto Rico passed an act entitled, "An Act Authorizing the Governor of Porto Rico to convey certain lands to the United States for naval, military, and other public purposes." Revised Statutes and Codes of Porto Rico, pp. 321, 322, §§ 1670–1677. Sections 1, 2, 4, 5, and 6 of which read as follows:

"Section 1. That the Governor of Porto Rico be, and he is hereby authorized *in his discretion* and in the name of The People of Porto Rico to convey to the United States for naval, military or other public purposes all the right, title and interest of the people of Porto Rico or of any municipality thereof in and to all public lands in the *island of Culebra,* together with the shores thereof and any public buildings thereon, or in and to so much thereof as may now or hereafter be desired by the United States for such purposes, and in and to any and all roads, streets or highways or other public property in said island of Culebra belonging to The People of Porto Rico or to any municipality thereof; together with all rights, easements, benefits and privileges thereunto appertaining.

"Sec. 2. That the Governor of Porto Rico be and he is hereby, authorized *in his discretion* and in the name of The People of Porto Rico to convey to the United States for naval, military, or other public purposes all the right, title and interest of The People of Porto Rico or of the municipality of San Juan in and to any or all public lands *in the Puntilla* in the harbor of San Juan, together with the shores thereof and any public buildings thereon, or in and to so much thereof as may now or hereafter be desired by the United States for such purposes, and in and to any streets or highways or other public property therein belonging to The People of Porto Rico or to the said municipality; together with all rights, easements, benefits and privileges thereunto appertaining. * * *

"Sec. 4. That the Governor of Porto Rico be and he is hereby *authorized* in the name of The People of Porto Rico to *release any interest or claim* that The People of Porto Rico may now have or may hereafter acquire in and upon any lands or buildings belonging to the United States in the Island of Porto Rico *which may be reserved* by the President of the United States for public uses under and by virtue of the power vested in him under the terms of an act of the Congress of the United States entitled 'An act authorizing the President to reserve public lands and buildings in the Island of Porto Rico for public uses and granting other public lands and buildings to the Government of Porto Rico, and for other purposes,' approved July first, nineteen hundred and two.

"Sec. 5. That consent be and is hereby given to the United States *to acquire for* naval, military or other public purposes, *by purchase* or condemnation, any lands within the Island of Porto Rico, and when so acquired and possession thereof shall have been taken by the United States, *all jurisdiction* over such lands by The People of Porto Rico *shall cease and determine: Provided, however,* That upon the subsequent alienation by the United States of any land so acquired The People of Porto Rico shall again have jurisdiction thereover.

"Sec. 6. That *exclusive jurisdiction* be and is hereby ceded to the United States over any and all lands that *may hereafter be acquired* by it in the Island of Porto Rico *by purchase* or condemnation; and over any and all lands and the shores thereof, including streets and other public highways, conveyed to it by the Governor of Porto Rico

under the provisions hereof; and *over any and all lands* in which *any interest or claim* of The People of Porto Rico may *hereafter be released* to the United States by the Governor of Porto Rico as provided herein: *Provided, however,* That in and over any lands acquired by or conveyed under the terms hereof to the United States, in the *island of Culebra,* The People of Porto Rico shall retain *a concurrent jurisdiction* with the United States over offenses committed within the limits of the lands so conveyed, such jurisdiction however to be exercised only upon the complaint of the officer of the Navy or other officer of the United States in charge thereof." (Italics supplied.)

Thus far it does not appear that the Governor of Porto Rico has released any interest the people of Porto Rico may have had in or claim to any lands or buildings belonging to the United States in the Island and reserved by the President, which release, under the Act of July 1, 1902 (48 US CA § 746), is made the express condition under which title should vest in the people of Porto Rico in or to "all the public lands and buildings, not including harbor areas and navigable streams and bodies of water and the submerged lands underlying the same, owned by the United States in said island and not so reserved"; nor that the people of Porto Rico had any interest, legal or equitable, in the Barracks; and, as that government did not come into existence until May 1, 1900, it could not have acquired any interest, legal or equitable, from the United States in the Barracks "prior to the first day of May, nineteen hundred," under the second proviso of section 1 of the Act of July 1, 1902, as the court below seems to intimate.

In 1904, the Roman Catholic Church brought suit against the people of Porto Rico (11 Porto Rico, 466) and at pages 492, 493, the following appears:

"Ever since the American occupation of the Island of Porto Rico claims have been made by the Roman Catholic Church, or by some of its members on its behalf, to certain lands, buildings and other property, situated in Porto Rico and in the possession of the American Government. Efforts were continually being made to induce the Government, both here and at Washington, to recognize these claims. After many plans had been discussed and rejected, finally the Insular Legislatures, on the 10th of March, 1904, passed a statute conferring on the

Supreme Court of Porto Rico original jurisdiction for the trial and adjudication of all questions between the church and the people affecting property rights, whether real, personal or mixed, claimed by either party. Power was conferred on this court, by said act, to issue process for witnesses, and to receive and hear testimony; and direction was given to use the same procedure, as near as might be, as that prescribed for the district courts in civil cases, full power being conferred on the court to enter any and all orders and decrees that might be necessary to a final and full adjudication of all the claims of either party to the proceedings, authorizing the issue of all writs or process necessary to enforce the jurisdiction therein conferred upon this court. * * * An appeal was reserved to each of the parties to the Supreme Court of the United States as in other cases. * * * See Session Acts of Porto Rico of 1904, pp. 134 and 135."

It further appears from the above-cited case that, under this Act of 1904, the Roman Catholic Bishop of Porto Rico filed a complaint against the people of Porto Rico in the Supreme Court of the Island on the 6th of June, 1904, asking that the defendant be adjudged "to return to the Roman Catholic Apostolic Church in this Island as properties seized by the Government of the Island from the religious communities of Dominicans and Franciscans suppressed under the laws issued in Spain relating to the secularization of church property, the building known by the name of the Convent of San Francisco, situated on the square of that name in this city [San Juan]; * * * the lots occupied by the market place and the streets adjacent thereto, and those occupied by the insane asylum"; also "the Convent of Santo Domingo [Santo Domingo Barracks] with the lands appurtenant thereto, as well as the lots upon which Ballaja Barracks is located." It further appears in that case that the Convent of San Francisco and the lands pertaining thereto were acquired at an early day by the religious community known as San Franciscans, and that the Convent of Santo Domingo and the lands appurtenant thereto were likewise acquired at an early day by the religious community of Dominicans; that the title to the property of the Dominican Friars was acquired by them from Juan Ponce de Leon, "the conqueror and first populator of the Island"; that in the year 1838 the religious communities of Dominican and Franciscan Friars were suppressed

by the Spanish government and their property seized under the so-called laws of secularization of church property published in Spain; that the properties so held by them were the exclusive properties of the Roman Catholic Church in accordance with the provisions of Concordats concluded with the Holy See in the years 1851 and 1859; that the Spanish government in Porto Rico never returned the property but retained the same in its possession until the change of sovereignty in the Island; and that the same subsequently passed, under the Treaty of Paris, to the government of the United States.

All the property in question in that suit the Supreme Court held belonged to the Church, and that all of it, with the exception of the Convent of Santo Domingo and the lots upon which the Ballajá Barracks were located, should be returned to the Church by Porto Rico, and that it also should make restitution of the "fruits or rents, etc." The Convent of Santo Domingo and the Ballajá Barracks were excepted out of the judgment of restitution because Porto Rico was not in possession and enjoyment of them, they having been reserved by the United States for military purposes, and the government of the United States not being a party to the action. However, the court in its opinion, 11 Porto Rico, at page 489 said:

"But we must say that the evidence heard in this action also shows that said Convent of Santo Domingo with the lands appurtenant thereto, as well as the lots upon which Ballajá Barracks is located, are the property of the Roman Catholic Apostolic Church, and that only upon a technical ground, strengthened by the respect we have for a decision of the President of the United States, we will not make the same pronouncement with regard to said property—that is to say, that it be returned to the Catholic Church, together with the other property sought to be recovered in this action."

In this situation, and while appeals to the Supreme Court of the United States were pending, in order to clear up the matter, on August 12, 1908, "an agreement was entered into * * * by a commission consisting of two persons appointed by the President of the United States, two persons representing the Roman Catholic Church of Porto Rico, and two persons representing The People of Porto Rico, appointed by the governor thereof, intended as a basis of set-

tlement of all matters of dispute between the Roman Catholic Church in Porto Rico, on the one part, and the United States of America and the People of Porto Rico on the other part, in which it was agreed, among other things, as follows: 'The United States to pay the Roman Catholic Church in Porto Rico the sum of $120,000 in full settlement of all claims of every nature whatsoever relative to the properties claimed by the Church, which are now in the possession of the United States, and are specified and described in the judgment rendered by the supreme court of Porto Rico in a certain suit No. 1, brought by the Church against the people of Porto Rico, in the supreme court of Porto Rico, the Church to relinquish all rights and actions regarding said properties, the said properties to *belong exclusively* to the United States.'" (Italics supplied.) See United States v. Iglesias, supra, 13 Porto Rico Fed. Reports 282 at page 288.

This agreement, as will hereafter appear, was carried out, and, if the people of Porto Rico had any right or claim in or to the lands and buildings reserved by the President, which it had not previously released [People of Porto Rico v. Fortuna Estates (C. C. A.) 279 F. 500, 507–508], it is fairly certain that in 1908, when the Governor, as the duly authorized representative of that government, became a party to this agreement, he thereby released any right, title, or interest the people of Porto Rico had in the properties reserved by the President, including the Santo Domingo Barracks. If at that time the people of Porto Rico had any claim to the properties which it did not intend to part with, it was then called upon to assert it or forever after hold its peace.

By an Act of March 4, 1909 (35 Stat. 1018) Congress appropriated $120,000 to be paid to the Church "in full satisfaction of all claims of every nature whatsoever relative to the properties claimed by the Roman Catholic Church in Porto Rico which are *now in the possession of the United States,* to wit, *the building known as the Santo Domingo Barracks* and the land pertaining thereto, and the site of the building formerly known as the Ballaja Barracks, * * * *Provided,* That the Roman Catholic Church shall guarantee the title to, and shall relinquish all rights and actions regarding *said properties, and that the said properties shall belong exclusively to the United States."* (Italics supplied.) On May 17, 1909, the

$120,000 was paid to the Church and "an act of sale was executed by the Bishop of Porto Rico, conveying to the United States all the rights of the Church of Porto Rico in the Santo Domingo Barracks, otherwise called 'Santo Domingo Convent.'"

From the foregoing it appears that the Supreme Court of Porto Rico, after hearing, declared that the Santo Domingo Barracks and the Barracks of Ballaja belonged to the Church, not the people of Porto Rico; and that, after that decision and pending the appeals therefrom, the Governor, through the Commission, two members of which were appointed by him to represent the people of Porto Rico, agreed that, on the Church relinquishing all its rights to the two Barracks, "the said properties" should "belong exclusively to the United States." By so doing the Governor released "any interest or claim that the People of Porto Rico" had in either property (both of which were reserved by the President) within the meaning of section 4 of the Porto Rican Act of February 16, 1903, and the United States thereby acquired exclusive jurisdiction over the same under section 6 of that Act. Then again, viewed from the standpoint that Spain had no title to these properties, as the Supreme Court of Porto Rico held—that the title was in the Catholic Church—then the United States, on purchasing the same in 1909 from the Church, acted within the provisions of sections 5 and 6 of the Act of February 16, 1903, and acquired exclusive jurisdiction over the same.

The money having been paid to, and the deed given by, the Church May 17, 1909, at the opening of the October term, 1909, of the Supreme Court of the United States, to wit, on October 11, 1909, the two appeals pending in that court were "dismissed, per stipulation." See People of Porto Rico v. Roman Catholic Church, 215 U. S. 611, 30 S. Ct. 397, 54 L. Ed. 348.

The government of the people of Porto Rico certainly had no jurisdiction, political or legislative, over the Barracks, the place where the offense was committed, prior to May 1, 1900. First, because the United States, through its military authorities and Congress, had that jurisdiction and control from 1898 to May 1, 1900. There can be no doubt about that. And, second, because the government of Porto Rico did not exist before May 1, 1900, so that it could not have had or exercised any political or legislative control over the Barracks or, for that matter, anywhere in the Island of Porto Rico prior to that date.

The question, therefore, resolves itself down to whether the United States, which had political and legislative control over the people and the territory comprising the Island of Porto Rico and certain adjacent islands, including the Barracks, lost that jurisdiction over the Barracks by the Foraker Act or any other act of Congress, or authority representing the United States. When Congress created the territorial government there in May, 1900, it conferred upon the people of Porto Rico political and legislative control over matters of purely local concern and over certain properties there situated and devoted to designated public uses (section 13 of the Act of April 12, 1900, 48 USCA § 747 note). But the properties there designated (section 13) did not include the Barracks and certain other properties devoted to public uses which, as heretofore shown, are dealt with in the Act of Congress of July 1, 1902.

We have also pointed out that in the Act of July 1, 1902, Congress, in dealing with the properties which were not reserved by the President, turned them over to the government of Porto Rico provided and upon the condition that it release all right or claim it had in any of the properties reserved by the President; that the Legislature of Porto Rico, in 1903, authorized and directed its Governor to release all right and claim to the properties reserved (section 4, Act of February 16, 1903); that the Governor, as early as 1908, if not earlier, released all right or claim therein, if Porto Rico had any; that, under section 6 of the Act of 1903, this release having been given, the United States acquired exclusive jurisdiction over the properties reserved, if it did not have it before and if the Legislature of Porto Rico had any authority to legislate with reference to the reserved properties and the jurisdiction of the United States over them, which is doubtful in the extreme; and, further, if the United States, by the cession of Spain, acquired no title to the Barracks and other properties reserved because the Catholic Church, as the Supreme Court of Porto Rico held, owned those properties, then the United States, when it purchased the Barracks from the Church, acquired exclusive jurisdiction by virtue of sections 5 and 6 of the Act of 1903, if it had not had it ever since the cession of Spain in 1898, which we think it then acquired and has since then kept.

The Supreme Court of Porto Rico, however, apparently entertains the view that, inasmuch as the Supreme Court and the District Courts of San Juan have been permitted by the military authorities of the United States in charge of the Barracks to occupy at sufferance the second floor of the building for court purposes, the government of Porto Rico has acquired legislative and political control of the second floor of the building and that its laws extend there and were violated. We do not accede to this view.

If in the District of Columbia the officers of the United States in charge of the treasury building had allowed the Supreme Court of Puerto Rico to occupy at sufferance quarters for court purposes and the assault in question had taken place there, could it reasonably be said that the United States had yielded up its exclusive jurisdiction over those quarters and that the legislative powers of the government of Puerto Rico extended there; that the assault was a breach of its laws; and that the alleged offender lawfully could be taken to Puerto Rico and tried first in the Municipal Court of San Juan, then on appeal in the District Court of San Juan, and then on appeal in the Supreme Court of Puerto Rico, as was done here?

In view of the conclusion reached, it is unnecessary to consider the other questions in the case.

The judgment of the Supreme Court of Puerto Rico is vacated, and the cause is remanded to that court, with directions to dismiss the action for want of jurisdiction.

MORTON, Circuit Judge (dissenting).

I regret that I am unable to agree; and as the jurisdictional question is of considerable importance I will state my views.

If the case is to be decided upon the principles of law which govern when similar questions arise between the jurisdiction of the United States and of the several states, the opinion of my brother BINGHAM, is, I believe, clearly correct. But I do not think that those principles apply here. No question of territorial jurisdiction between different sovereignties is involved. There is but one sovereignty in Puerto Rico; that of the United States. For the purpose of self-government in local affairs, the United States has set up by statute a local government; the people of Puerto Rico. But the insular government is in no sense an independent state; it is the creature of Congress and can be abrogated or changed at the

438

pleasure of Congress. Laws made by it derive their sanction from the authority of the United States.

This being so, the question before us is merely whether the United States, acting through Congress and its duly authorized officials, intended that laws passed by the Puerto Rico Legislature should be in force in the quarters assigned by officials of the United States with the tacit approval of Congress for the exclusive use of the Puerto Rico courts. The plain common sense of the matter overwhelmingly demands an affirmative answer; and on questions of this character strong practical reasons carry weight.

When this country took over Puerto Rico from Spain, it found the Spanish courts sitting in the building known as the Santo Domingo Barracks, in the same quarters where the assault in question occurred. Our first civil courts in Puerto Rico, established by military order, were put into the rooms which had been occupied by the Spanish courts which preceded them. They there enforced local law. The Foraker Act which established the first civil government in Puerto Rico under the United States made special provision for the appointment of a Supreme Court of Puerto Rico, but no provision for quarters for it. Plainly, the understanding was that the court would sit where the corresponding court established by military order had sat. This understanding was carried out and the Supreme Court established under the Foraker Act was housed in the old building. The Organic Act of March 2, 1917 (39 Stat. 951) continued the Supreme Court established by the Foraker Act. Again no provision was made for quarters for this important tribunal. The reason for this omission must have been, it seems to me, that it was assumed that the court would continue to sit where its predecessors had always sat since the beginning of United States rule in the Island. That United States officials in charge of the Santo Domingo Barracks so understood the matter is shown by the fact that the Supreme Court established under the Act of 1917 was given the same quarters as its predecessor. It still occupies them. Congress has never made any provision for housing the Supreme Court of Puerto Rico created by its own statutes. The inference is irresistible, I think, that Congress knew and approved the arrangements made for that purpose, and intended them to be continued.

This approval implied, almost necessarily as it seems to me, that the Puerto Rico laws, which those courts enforced and on which they relied for the protection of their officials and their property, should be in force in the quarters assigned to them. Whether the legal title to the building is in the United States or in the people of Puerto Rico is not of much importance on this point. It is a question of congressional, or perhaps of governmental, intention. There is but one government in Puerto Rico; that of the United States. To suppose that this government set up a local Legislature and local courts to enforce local laws, and then put those courts into a place where the local laws did not run, so that an assassin, who should kill the Chief Justice of Puerto Rico while holding court in the Santo Domingo Barracks, or a thief who should steal court-funds or papers there, could not be punished under Puerto Rico law, is to attribute to the United States an impossible degree of absurdity.

In Rivera v. Lawton (C. C. A.) 35 F. (2d) 823, 824, where the contention was made that the Supreme Court of Puerto Rico was sitting in a place (the Santo Domingo Barracks) where it had no jurisdiction, like a New York court sitting in Massachusetts, and that its judgments were therefore void, this court said in its opinion: "That from the beginning of our occupation Congress has, at least by necessary implication, approved of the use of the Santo Domingo Barracks by the Porto Rican courts. The contention that for 30 years all the proceedings of the Supreme Court and the two District Courts of San Juan are void seems to us too far-fetched and revolutionary to be dignified by prolonged discussion." Anderson, J., 35 F.(2d) page 824. The Iglesias Case, supra, decided nothing to the contrary. The crime there in question was committed in a public part of the building, which was in the actual possession and control of the United States military authorities, not in the court quarters; and the crime had nothing to do with the Puerto Rico courts. While the facts in Re Neagle, 135 U. S. 1, 10 S. Ct. 658, 34 L. Ed. 55, were quite different from those in the case at bar, the legal assumptions on which that decision rests apply, as the Supreme Court of Puerto Rico suggested, to the case before us. The Neagle Case strengthens the view that Congress, in assenting to quarters for the Puerto Rico courts being established in the Santo Domingo Barracks, understood that

the Puerto Rico law would be in force in such quarters, at least to whatever extent might be necessary to protect the officials and the property of those courts.

In the taking over of an old Spanish possession by the United States and the necessary rearrangement of the government of it, not a simple undertaking, it was almost inevitable that some minor points would be overlooked. If afterwards such points become critical they should be dealt with in a sensible and practical way in the light of historical facts. Leaving the Puerto Rico courts in the old Spanish courthouse, and then reserving that building to the United States, without explicit provisions that the Puerto Rico law should be in force in the courthouse part of it may have been a minor oversight of that character. If so, it should be dealt with on that footing. I think that the Puerto Rico courts had jurisdiction of this case.

There was no substantial controversy about the assault. The defendant presented himself to the attendant and asked to see the Chief Justice. He was shown into the office and without any provocation struck Judge del Toro in the face. The reason for the assault, as stated by the defendant, was that he disapproved Judge del Toro's participation in a public celebration, which had been held the day before, of the bicentennial of Washington's birthday. The defendant testified that he said to Judge del Toro, "Acts like the one celebrated last night, perpetrated in this Island and so ostensibly (ostentatiously?) patronized by you, constitute an open challenge to our country; and I have accepted the challenge, the offense inflicted by you to the whole Island, and must return this offense to you as you are a traitor and a scoundrel." The blow followed; and the defendant was arrested as he left the room. The defendant testified, in substance, that the purpose of the assault was to provoke Judge del Toro into a duel.

The language of the Puerto Rico statute establishing the crime of aggravated assault on an officer appears to be similar to that of a Texas statute (Pen. Code Tex. 1925, art. 1147) under which it was held that "to constitute an aggravated assault on an officer, it must appear that the person assaulted was an officer in the discharge of his duties, and that the assault was made as an interruption of his official duties." Curlin v. State, 84 Tex. Cr. R. 602, 209 S. W. 666. Judge del Toro testified as above stated that he was in his office "to work on court matters";

that he was about to resume his work, after having finished luncheon there, when the assault occurred. I do not think it can be said that an assault under such circumstances, of insulting character, the avowed purpose of which was to provoke a duel, might not be found to be of aggravated character, not that such a finding, in which all three local courts agreed, should be set aside as clearly unwarranted by the evidence. Local views of conduct in such matters are entitled to much weight and should be accepted within limits not exceeded in the present case.

The other points argued for the defendant seem to me not well founded nor to require discussion. I think the judgment appealed from should be affirmed.