**PEOPLE OF PUERTO RICO,**
Plaintiff, Appellee,

v.

**Gerald Thomas KOEDEL,**
Defendant, Appellant.

**No. 90–1471.**

United States Court of Appeals,
First Circuit.

Heard Nov. 7, 1990.

Decided March 7, 1991.

Marc Richman, Appellate Staff, Civ. Div., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Daniel F. Lopez–Romo, U.S. Atty., Miguel A. Fernandez, Asst. U.S. Atty., and Barbara L. Herwig, Appellate Staff, Civ. Div., Dept. of Justice, were on brief for defendant, appellant.

Carlos Lugo–Fiol, Asst. Sol. Gen., with whom Jorge E. Perez–Diaz, Sol. Gen., and Norma Cotti–Cruz, Deputy Sol. Gen., Dept. of Justice, were on brief for plaintiff, appellee.

Before CAMPBELL, TORRUELLA and CYR, Circuit Judges.

TORRUELLA, Circuit Judge.

Private Gerald T. Koedel appeals his conviction for simple assault and battery upon a newspaper photographer on a stretch of

---

land which was part of a United States military installation in San Juan, Puerto Rico. Charges were originally filed before the Commonwealth courts under the applicable provision· of the Puerto Rico Penal Code, and the defendant then removed the case to the United States District Court for the District of Puerto Rico. Finding that the Commonwealth lacked jurisdiction to prosecute Private Koedel for events occurring at the site, we reverse.

## I. THE FACTS

On February 23, 1990, Fort Buchanan was conducting emergency procedures in response to a bomb threat received at the installation earlier that day. Admittance to the premises was being strictly monitored by military personnel, causing a large traffic backup in the roadway providing access to the base. Sometime early that afternoon, THE SAN JUAN STAR, a daily newspaper in Puerto Rico, sent photographer José Feliciano to report on. the events for the press.

Upon reaching the road[1] leading up to Fort Buchanan's main gate, Mr. Feliciano began taking pictures of the congested traffic conditions and, particularly, of the gate. When the military police noticed the unidentified photographer, they sought guidance through the telephone from their supervisor, Sergeant Arthur Christiansen, who confirmed that the photographer was violating Fort Buchanan rules by photographing gate procedures on base property without having identified himself as a person having authorization to do so. Standard base procedure called for gate personnel to ask the subject for identification and, if no such identification was provided or if, upon being provided, it was determined that the subject lacked proper authorization, then the film had to be confiscated and developed to determine whether the photographs taken compromised the securi-

ty of the base. An order was given by Sgt. Christiansen to that effect, the specific terms of which were the subject of considerable dispute at trial. In any event, Specialist Allan Gray, who received the order, relayed it to Private Koedel, who then proceeded to carry out the same.

As was to be expected, conflicting testimony was also presented at trial concerning what transpired next. It appears that Private Koedel first approached Feliciano, told the photographer that he could not take pictures on base property, and then demanded that he hand over the film. After identifying himself as a newspaper photographer, Feliciano refused to surrender his camera and continued to take pictures, some of which included the military policeman's approach. Koedel next made an unsuccessful attempt to take possession of the photographer's camera, then reached for the identification badge hanging from Feliciano's shirt. The incident occurred a short distance from the main gate, but still on federal grounds. *See* footnote 1, supra. In the private's intervention with the photographer, some physical contact was apparently involved.

## II. THE DISTRICT COURT'S OPINION

Through an oral opinion, the district court considered three principal issues, all of which were resolved in favor of the prosecution. First, the lower court determined that the Commonwealth of Puerto Rico and the Government of the United States enjoyed concurrent jurisdiction over the 1.23 acres of land immediately adjacent to the installation's main gate, thus opening the door for the filing of criminal charges against appellant in the Commonwealth courts and the subsequent removal of the case to the federal courts. Then, appellant was denied the immunity afforded to federal officers acting under the laws

---

1. This road, which additionally provides access to an adjacent residential area, runs through a 1.23–acre quasi-rectangular plot of land immediately preceding the base's main gate and is property of the United States Government. The federal government, however, granted an easement over this portion of land to the Commonwealth of Puerto Rico for the construction of the road and related public works. The easement, among other things, imposed upon the Government of Puerto Rico the responsibility for preserving the road in good condition, and freed the United States from responsibility for damages to property or persons arising from, or incidental to, federal governmental activities.

of the United States because his actions were not deemed to be "necessary and proper" for the performance of his duties, as required by precedent. *In re Neagle*, 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55 (1890). Finally, the trial court convicted appellant of simple assault and battery under Article 94 of the Puerto Rico Penal Code, concluding that all elements required for conviction under the statute, and particularly the element of criminal intent, had been proven by the prosecution beyond a reasonable doubt. Our disposition of the case on jurisdictional grounds, however, renders our review of the latter two issues unnecessary.

## III. DISCUSSION

Resolution of the jurisdictional issue requires us to begin with a brief overview of history. The end of the Spanish–American War saw Spain and the United States enter into the Treaty of Paris, signed on December 10, 1898, and ratified in Washington, D.C., on April 11, 1899, through which Spain ceded its sovereignty over Puerto Rico to the United States. P.R.Laws Ann. tit. 1, p. 17. On April 12, 1900, Congress enacted the Foraker Act, which provided for the establishment of the first civil government in Puerto Rico to replace the military government which had thus far been instituted on the Island. 31 Stat. 77. The Foraker Act also created the Puerto Rico Legislature and authorized it to exercise local legislative powers, subject, in all instances, to Congressional veto. *Id.*, §§ 27–32. Following the enactment of the Act of July 1, 1902, 32 Stat. 731, wherein Congress authorized the President of the United States to reserve public lands and buildings in Puerto Rico for public use, on February 16, 1903, the Legislature of Puerto Rico passed an act in which it consented to the acquisition of various public lands and buildings by the federal government. Revised Statutes and Codes of Porto Rico, §§ 1670–1677 (hereinafter, the Act of 1903). Pertinent to our purposes, this piece of legislation provided that when property

was "so acquired and possession … taken by the United States, all jurisdiction over such lands by the People of [Puerto] Rico [would] cease and determine." *Id.*, § 1674. Moreover, the Act explicitly ceded "exclusive jurisdiction" over the acquired property to the United States. *Id.*, § 1675.[2]

On March 2, 1917, Congress passed the Jones Act, granting Puerto Rico a new governmental framework and its residents citizenship in the United States. 39 Stat. 951. Like the Foraker Act, the Jones Act placed all property acquired from Spain by the United States within the territorial boundaries of the Island under the control of the Government of Puerto Rico. The Jones Act also contained a provision authorizing the President to accept from the Government of Puerto Rico any "lands, buildings, or other interests or property" which might be needed for public purposes. *Id.*, § 7. Pursuant to this latter provision, on June 17, 1925, the Legislature of Puerto Rico passed Act Number 33, 1925, Laws of Puerto Rico, pp. 190–197, under the authority of which the lands which now comprised Fort Buchanan were conveyed to the United States on March 23, 1928.

Notwithstanding the provisions contained in the laws of Puerto Rico regarding jurisdiction of lands acquired by the United States within the territorial limits of the Island, supra, on February 1, 1940, Congress passed an act in which it empowered:

> the head … of any department … or agency of the Government … [to] accept or secure from the States in which any lands or interests therein under his [or her] immediate jurisdiction, custody, or control are situated … cession of … jurisdiction, exclusive or partial, not theretofore obtained, over any such lands or interests as he may deem desirable and indicate acceptance of such jurisdiction on behalf of the United States …

40 U.S.C. § 255.[3] As a result of this Act, on July 27, 1945, the Secretary of War

---

**2.** The Act of 1903 further provided that should the United States "alienate" the lands involved, jurisdiction would revert back to the Government of Puerto Rico. *Id.*, § 1674.

**3.** The Act additionally provided that unless and until the United States had accepted jurisdiction over all lands to be acquired after the date of its enactment, "it shall be conclusively presumed

accepted by letter exclusive jurisdiction over all lands conveyed to the United States for which such jurisdiction had not been accepted.[4] On August 10, 1945, the Governor of Puerto Rico signed this letter, confirming the Secretary of War's acceptance of jurisdiction. Finally, after the creation of the Commonwealth of Puerto Rico in 1952, the Puerto Rico Legislature acknowledged the exclusive federal jurisdiction of lands held by the United States within its territorial boundaries. P.R.Laws Ann. tit. 28, § 46.[5]

Given this historical background, concluding that the Commonwealth of Puerto Rico lacked jurisdiction to prosecute appellant for events occurring on the 1.23 acre plot of land gives us little pause. Whether exclusive jurisdiction was acquired under Article I, § 8, cl. 17, of the United States Constitution, which permits the United States to obtain exclusive jurisdiction over lands within a State, or under Art. IV, § 3, cl. 2, which grants Congress the power to make all needful rules and regulations regarding territories or other properties belonging to the United States, an undeniable fact which conclusively forecloses any further inquiry into the matter is that the federal government does possess exclusive jurisdiction over the lands on which Fort Buchanan now lies, including the 1.23 acre plot of land on which the events giving rise to this appeal took place. *Cf. Capitol Construction v. Secretary of the Treasury*, 89 P.R.R. 319, 323 (1963) (jurisdiction over military bases in Puerto Rico acquired prior to 1955 is exclusively in the United States). Exclusive federal jurisdiction in this con-

text can mean only one thing: that it is the United States Government, and only the United States Government, which has the power or authority to prosecute an individual for criminal acts committed on these grounds, grounds which unquestionably include the 1.23 acre plot of land immediately preceding the entrance to the base. *Cf. Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 396, 5 L.Ed. 257 (1821) ("State courts have a concurrent jurisdiction with the federal Courts, in cases to which the judicial power is extended, unless the jurisdiction of the federal Courts be rendered exclusive"). Since the Commonwealth of Puerto Rico lacked jurisdiction to prosecute the appellant, his conviction must be vacated. *See Velázquez v. People of Puerto Rico*, 77 F.2d 431 (1st Cir.1935) (vacating conviction for aggravated assault by the local courts of Puerto Rico for acts committed on premises under exclusive federal jurisdiction).

The district court nevertheless found that the Commonwealth enjoyed concurrent jurisdiction with the federal government over the 1.23 acre plot of land on the basis of three principal considerations. First, the lower court determined that the lease agreement entered into by the two governments, whereby the Commonwealth was given the responsibility of performing the necessary construction and maintenance works in the plot of land in question, *see* footnote 1, *supra*, denoted such a joint control over the zone that concurrent jurisdiction existed *de facto*, if not properly *de jure*. Second, the court found it significant that a wide range of civilian activities, in-

---

that no such jurisdiction has been accepted." 40 U.S.C. § 255. This Act, of course, applied generally to all States, territories, and possessions of the United States and did not take into account what effect, if any, the Puerto Rico Legislature's Act of 1903 (ceding exclusive jurisdiction to the United States over all lands acquired by the federal government within Puerto Rico) would have in its application, a matter over which we also express no opinion. In any event, the lands of Fort Buchanan were acquired prior to the enactment of 40 U.S.C. § 255.

**4.** Congress has additionally provided that were the Secretary of War to determine that the jurisdiction of the United States over lands under his

control should revert to the State or territory in question, relinquishment may be accomplished through the filing of a notice of relinquishment with the governor of the state or territory to take effect upon acceptance thereof, or through any other means as the laws of the state or territory may provide. 10 U.S.C. § 2683.

**5.** Sections 54 and 55 of Title 28 of the Laws of Puerto Rico further provided that, for land acquired after 1955, exclusive jurisdiction would be granted to the United States only when the Governor of Puerto Rico deems it to be in the best interests of the Commonwealth. As noted above, the lands of Fort Buchanan were acquired prior to 1955.

cluding the daily operation of a hot-dog stand, took place at the site, and that the military authorities' intervention with these activities was minimal. Third, the court assumed that the prosecution of traffic violations and any other criminal incidents would also be the responsibility of the local authorities because it did not know of any such proceeding which had been brought before the federal courts in recent years, a fact which presumably also supported a finding of concurrent jurisdiction. We are of the opinion, however, that none of these considerations, either collectively or individually, can have the effect attributed to them by the district court. Simply stated, we are aware of no theory, and neither the appellee nor the district court has cited any, under which exclusive jurisdiction can be implicitly transformed into concurrent jurisdiction through actions other than legislative intervention. *Cf. Fort Leavenworth R.R. Co. v. Lowe,* 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264 (1885) ("[T]he rights of sovereignty [are] not to be taken away by implication").[6] In the interest of thoroughness, however, we address each of these considerations in some detail.

The fact that the federal government granted the Commonwealth an easement over the 1.23 acre plot of land for the construction of a road and related public works, though true, can be the source of no jurisdictional consequences. Supreme Court precedent has established that exclusive federal jurisdiction is not lost by a lease of rights to exploit parts of a reservation for oil, gas, and an oil pipeline, *Humble Pipe Line Co. v. Waggonner,* 376 U.S. 369, 84 S.Ct. 857, 11 L.Ed.2d 782 (1964); nor by a lease of property for commercial purposes within an enclave, *Arlington Hotel Co. v. Fant,* 278 U.S. 439, 49 S.Ct. 227, 73 L.Ed. 447 (1929); nor by the conveyance of a right-of-way to a railroad across a reservation, *United States v. Unzeuta,* 281 U.S. 138, 50 S.Ct. 284, 74 L.Ed. 761 (1930);

nor by the use of part of a reservation for farming purposes, *Benson v. United States,* 146 U.S. 325, 13 S.Ct. 60, 36 L.Ed. 991 (1892). In fact, the terms of the easement expressly provided that "the use and occupation of [the lands] shall be the subject of such rules and regulations as the [officer having responsibility over said premises] may prescribe from time to time in order to protect the interests of the United States." Easement, Par. 4. It follows, then, that whatever control the Commonwealth acquired over the area as a result of the easement does not translate into concurrent jurisdiction to prosecute appellant for events occurring on this stretch of land.

As for the statement suggesting that the occurrence of unregulated civilian activities at the site indicates the existence of concurrent jurisdiction, we believe the lower court is confusing the notions of areas subject to exclusive federal jurisdiction where access to the public is restricted and areas under exclusive federal jurisdiction where access to the public is unrestricted. There are many properties under exclusive federal jurisdiction, such as post offices, courthouses and parks, to which the public commonly has access. The fact of public access in no way detracts from the existence of exclusive federal jurisdiction. Given the particular physical circumstances of the area in question, the location of the main gate at a position a few feet removed from the utmost boundary of the military compound has allowed the public to enjoy unrestricted access to this section of the base, yet it does not disturb the fact that jurisdiction over the whole area lies exclusively with the United States. And, while the presence of the hot-dog stand might denote a degree of irresponsibility on the part of the authorities whose duty it is to regulate

---

6. In fact, whenever the Government of Puerto Rico was to retain concurrent jurisdiction over a particular grant of land, this circumstance has been expressly stated. Thus, in § 6 of the 1903 Act, it was provided that "in any and over any lands acquired by or conveyed under the terms hereof to the United States *in the island of Culebra, the People of [Puerto] Rico shall retain* a concurrent jurisdiction with the United States over offenses committed within the limits of the land so conveyed." Needless to say, no such provision accompanied the cession of the lands where Fort Buchanan was built.

the sale of comestibles on federal grounds, it certainly cannot serve to confer judicial power upon courts which do not possess it in their own right.

Finally, the allegation that criminal incidents occurring at the site are generally prosecuted by the local authorities has absolutely no basis on the record. Appellee, seeking support for this contention, points to the testimony of United States Army Captain José M. Cabrero, the officer in charge of the military police at the base. A review of the trial transcript reveals, however, that Captain Cabrero simply stated that when traffic incidents occurred at the site and it was determined that no military personnel was involved, the military authorities did investigate the incident along with the local police, but their report was sent to the Judge Advocate General Corps officer for determination as to the appropriate actions to be taken. Although Captain Cabrero testified that federal charges were not pressed under these circumstances, he also stated that, to the best of his knowledge, no cases of this nature have ever been prosecuted in the local courts. This being the case, we see no need to pursue this point any further.

The Commonwealth's position on appeal does not require extensive treatment. Appellee's brief first enumerates a number of circumstances which presumably demonstrate the federal government's lack of interest in enforcing its jurisdiction, and the law, in the 1.23 acre plot of land, then vehemently argues that the Commonwealth has a paramount interest in preserving law and order throughout its entire territory.[7] On the basis of these premises, appellee then invites us to follow the district court's "vision" and search beyond the limits of the exclusive jurisdiction doctrine to hold that the Commonwealth and federal governments actually enjoyed concurrent jurisdiction over this small portion of land. That, however, is something we cannot do. When the branches of our respective governments entrusted with the authority

to delineate their corresponding jurisdiction have spoken, the duty of the courts is to ensure that such limits are observed. Until additional legislative action is taken, jurisdiction to prosecute defendants for crimes committed on the grounds of Fort Buchanan, including the 1.23 acre plot of land immediately preceding the entrance to the base, lies exclusively with the United States. Private Gerald T. Koedel's conviction is therefore,

*Reversed and vacated.*

---

**7.** We note that at trial, however, the testimony of Mr. Adolfo Moreno, an engineer with the United States Army Corps, revealed that the General Services Administration recently attempted to sell this plot of land but no buyers, not even the Commonwealth, were interested in purchasing it.