Alfred **KOREN**, Plaintiff,

v.

**MARTIN MARIETTA SERVICES, INC.,**
Martin Marietta Corporation,
Defendants.

**Civil No. 96–1696(JP).**

United States District Court,
D. Puerto Rico.

March 6, 1998.

Peter John Porrata, San Juan, PR, Carlos M. Vergne Vargas, Limeres, Vergne, & Durán, Santurce, PR, for Plaintiff.

Alfredo M. Hopgood, McConnell Valdés, San Juan, PR, Víctor M. Comolli, Schuster Usera Aguiló & Santiago, San Juan, PR, for Defendants.

### *ORDER*

PIERAS, District Judge.

## I. INTRODUCTION

The Court has before it the Defendants' Brief in Compliance with this Court's Initial Scheduling Conference Order (**docket No. 31**); Plaintiff's Reply (opposition), which was never docketed; Defendants' Reply to Plaintiff's Brief (docket No. 39); and Plaintiff's Motion in Reply to the Reply of Defendant's [sic] Reply to Plaintiff's Brief (sur-reply), which also has not yet been docketed.[1] The Clerk of the Court is hereby instructed to docket Plaintiff's submissions.

Plaintiff initially filed this action on June 10, 1994 in Commonwealth Court asserting that the Defendants, his former employer and its owner, violated Puerto Rico wage-and-hour laws.[2] After appeal to the Puerto Rico Circuit Court of Appeals, Region I, the complaint was amended in 1996 to state a cause of action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219. The Defendants opted to remove the case to this Court pursuant to 28 U.S.C. §§ 1441–1452, based on federal question jurisdiction. Codefendant Martin Marietta Services ("MMS"), now known as Lockheed Martin Services, is a subsidiary of codefendant Martin Marietta Corporation, which is now

---

**1.** The Court also has before it Defendants' Brief Motion Supplementing Motion for Summary Judgment (**docket No. 48**) and Plaintiff's Motion Requesting *Extension of Time to Reply to Brief Motion Supplementing Motion for Summary Judgment* (**docket No. 49**). The Court will not consider Defendants' motion. It discusses issues not raised in their initial motion, and, as the Court herein orders the parties to file specific briefs, the Court has no use for Defendants' supplemental motion. Moreover, in submitting this brief, Defendants failed to comply with local rules requiring court permission for additional briefs. In light of the Court's ruling on the Defendants' motion, Plaintiff's motion is **MOOT.**

**2.** Although the Court herein refers to wage-and-hour laws, Koren's Complaint is based solely on the "hours" portion of those laws; he does not assert that he was not paid at a high enough rate.

known as Lockheed Martin Corporation (collectively, "Defendants").

Plaintiff worked for MMS and its corporate predecessors from 1969 to 1992. In 1980, his position was re-classified to Planning and Installation ("P & I") engineer. The Plaintiff asserts that from the moment he was reclassified, MMS (1) failed to pay him for overtime and meal breaks in accordance with Puerto Rico's Law 379, P.R.Laws Ann. tit. 29, §§ 271–299 (1985), and/or (2) failed to pay him overtime in accordance with the FLSA. 29 U.S.C. § 207(a)(2). Koren claims that MMS incorrectly classified him as exempt from Law 379's and the FLSA's provisions to avoid paying him the claimed amounts. *See* P.R.Laws Ann. tit. 29 §§ 246e, 299; 29 U.S.C. § 213 (exempting employees employed in a bona fide executive, administrative, or professional capacity). Koren seeks compensation for the years from 1980 to 1992, in accordance with P.R.Laws Ann. tit. 29, § 282 (1985) (providing for claims for sums unpaid plus an equal sum as liquidated damages). He claims $540,000 in back pay for meal breaks that he worked and $1,430,-000 in back pay for overtime, plus an equal amount as liquidated damages under Puerto Rico law, for a total of $3,940,000. He also states that he was not paid overtime in compliance with the FLSA, without specifying the amount sought.

The Court ordered the parties to brief several legal issues that were brought up during the Initial Scheduling Conference. The purpose was to dispose of such issues as a matter of law, thereby narrowing the scope of this litigation to only legally valid claims. In essence, the Court wished the Defendants to provide either a Motion to Dismiss under Rule 12(c) or, where matters outside the pleadings needed to be considered, a Motion for Summary Judgment.

The Defendants have presented the following arguments: first, the Plaintiff is exempt from both Puerto Rico and federal wage-and-hour laws because he is an administrator and/or a professional; second, as a matter of federal law, Puerto Rico's employment laws have no application to the Plaintiff with respect to his work for MMS because his work was conducted within a federal enclave; third, as a matter of Puerto Rico law, Puerto Rico's laws have no extraterritorial effect in a federal enclave, in the Virgin Islands, or at sea; fourth, the Commonwealth of Puerto Rico cannot regulate and/or interfere with federal activities and/or installations that are immune; and fifth, the Federal Service Contract Act establishes the regulatory system that governed the Plaintiff's wages and benefits for his work at MMS. The Court will attempt to address each argument using the items supplied by the parties. In doing so, the Court believes prudence requires the determination of applicable law be undertaken first. Additional relevant facts will be brought out as necessary, along with the source of those facts.

## II. FEDERAL ENCLAVES

In his Complaint, Alfred Koren asserts that he "worked for [MMS] at different parts of the Roosevelt Roads Base, Vieques and El Yunque." Roosevelt Roads is a United States naval base on the eastern coast of Puerto Rico's mainland. Vieques is a small island several miles off of the coast where Roosevelt Roads is located; the Navy owns and occupies two-thirds of Vieques. El Yunque, also known as the Caribbean National Forest, is a national forest owned by the United States government and administered by the United States Department of Agriculture, United States Forest Service. Pico del Este, or East Peak, is a mountain in El Yunque on which a communications facility is located. Pursuant to a memorandum of understanding, the United States Navy uses the communications facility to house a Guided Missile Control Center. Defendants contend these locations are "federal enclaves," sites where local law, including Puerto Rico's wage-and-hour laws, does not apply.

### A. ROOSEVELT ROADS

■ The United States Constitution endows Congress with:

Power to exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States,

and to exercise like Authority over all Places purchased by the Consent of the Legislature of the States in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings.

U.S. Const. Art. I § 8. "The Clause has been broadly construed, and the acquisition by consent or cession of exclusive or partial jurisdiction over properties for any legitimate governmental purpose beyond those itemized is permissible." *Kleppe v. New Mexico*, 426 U.S. 529, 542 n. 11, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976) (citing *Collins v. Yosemite Park Co.*, 304 U.S. 518, 528–30, 58 S.Ct. 1009, 82 L.Ed. 1502 (1938)). Pursuant to the Clause, "Congress may acquire derivative legislative power from a State ... by consensual acquisition of land, or by nonconsensual acquisition followed by the State's subsequent cession of legislative authority over the land." *Kleppe*, 426 U.S. at 542. "In either case, the legislative jurisdiction acquired may range from exclusive federal jurisdiction with no residual state police power [citations omitted], to concurrent, or partial federal legislative jurisdiction, which may allow the State to exercise certain authority." *Id.* (citations omitted).

In 1903, the Puerto Rico legislature passed the following law:

That consent be and is hereby given, to the United States to acquire for naval, military or other public purposes, by purchase or condemnation, any lands within the island of Porto Rico, and when so acquired and possession thereof shall have been taken by the United States, all jurisdiction over such lands by the People of Porto Rico shall cease and determine [terminate]; Provided, however, that upon the subsequent alienation by the United States of any land so acquired, the People of Porto Rico shall *again* have jurisdiction thereover."

Act of Feb. 16, 1903, 1903 P.R.Laws, p. 110 § 5 (hereinafter "Act of 1903"). This law was repealed in 1955, Act of June 10, 1955, 1955 P.R.Laws, p. 228, at which time it was superseded by the Act now codified at P.R.Laws Ann. tit. 28 §§ 44, 46. In 1940, the United States' Congress codified the long-

standing rule that federal ownership of land within a state does not, without more, imply either a total or partial corresponding transfer of jurisdiction:

Notwithstanding any other provision of law, the obtaining of exclusive jurisdiction in the United States over lands or interests therein which have been or shall hereafter be acquired by it shall not be required; but the head or other authorized officer of any department or independent establishment or agency of the Government may, in such cases and at such times as he may deem desirable, accept or secure from the State in which any lands or interests therein under his immediate jurisdiction, custody, or control are situated, consent to or cession of such jurisdiction, exclusive or partial, not theretofore obtained, over any such lands or interests as he may deem desirable and indicate acceptance of such jurisdiction on behalf of the United States by filing a notice of such acceptance with the Governor of such State or in such other manner as may be prescribed by the laws of the State where such lands are situated. Unless and until the United States has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted.

Act of Feb. 1, 1940, ch. 18, 54 Stat. 19 (1940) (codified as amended at 40 U.S.C. § 255). *See Collins v. Yosemite Park & Curry Co.*, 304 U.S. 518, 522–24, 58 S.Ct. 1009, 82 L.Ed. 1502 (1938); *Silas Mason Co. v. Tax Comm. of WA*, 302 U.S. 186, 197–99, 58 S.Ct. 233, 82 L.Ed. 187 (1937); *James v. Dravo Contracting Co.*, 302 U.S. 134, 141–42, 58 S.Ct. 208, 82 L.Ed. 155 (1937).

▮ By these statutes, the Puerto Rico legislature appears to have ceded legislative jurisdiction over any lands acquired by the United States, but the United States legislature, reiterating long established jurisprudential precedent, refused to take such control where it did not actually accept legislative jurisdiction. Before the United States acquires exclusive jurisdiction, it must affirmatively accept that jurisdiction. *United States v. Johnson*, 994

F.2d 980, 984–5 (2d Cir.), *cert. denied,* 510 U.S. 959, 114 S.Ct. 418, 126 L.Ed.2d 364 (1993). "The United States [can] not be forced to accept unwanted legislative jurisdiction." *Johnson,* 994 F.2d at 984. Therefore, general ceding statutes, such as Puerto Rico's Act of 1903, are insufficient in themselves to transfer legislative authority. *Id.* In addition to the state's consent to exclusive federal jurisdiction over the land acquired, the federal government "must indicate acceptance to the governor of the state." *Id.* (citing 40 U.S.C. § 255). The federal government may so indicate either formally, such as by proclamation, or "by such other manner as may be prescribed by the laws of the State where such lands are situated." 40 U.S.C. § 255.

"On July 27, 1945, the [United States] Secretary of War accepted by letter exclusive jurisdiction over all lands conveyed to the United States for which such jurisdiction had not been accepted" under 40 U.S.C. § 255, and "on August 10, 1945, the Governor of Puerto Rico signed this letter, confirming the Secretary of War's acceptance of jurisdiction." *People of Puerto Rico v. Koedel,* 927 F.2d 662, 664–5 (1st Cir.1991).

The parties have not provided the Court with evidence of exactly when Roosevelt Roads was acquired by the Navy. But the Court, using its own research, can determine that the United States has exclusive legislative jurisdiction over the base. The Puerto Rico Supreme Court determined that the lands used "for the construction of ... Roosevelt Roads Naval Base were acquired by the federal government prior to 1955." *Capitol Constr. v. Secretary of Treasury,* 89 P.R.R. 319, 323 (1963) (holding that the Commonwealth's jurisdiction over Roosevelt Roads has ceased and is now exclusively with the federal government). If Roosevelt Roads was acquired prior to the Secretary of War's letter of July 27, 1945, that letter constitutes formal acceptance under § 255. But even if Roosevelt Roads was not acquired prior to 1945, it was acquired and occupied prior to 1955, the date when Puerto Rico's cession statute was amended. *Capitol Constr.,* 89 P.R.R. at 323. Therefore, regardless of whether the federal government ever executed a formal acceptance, the Navy accepted exclusive jurisdiction by complying with Puerto Rico's Act of 1903. As the court in Johnson stated, "[t]he United States [is authorized] to accept jurisdiction by complying with state law requirements governing succession ... [t]he act of compliance with those requirements is tantamount to formal acceptance." 994 F.2d at 985. Puerto Rico's Act of 1903 states that when the United States acquired land in Puerto Rico by purchase or condemnation and took possession thereof, Puerto Rico's jurisdiction over such land would terminate—i.e., jurisdiction would cede to the United States. By acquiring and taking possession over the land on which Roosevelt Roads is situated, the Navy complied with Puerto Rico's cession law. Therefore, under 40 U.S.C. § 255, the United States indicated acceptance of exclusive jurisdiction over Roosevelt Roads Naval Station.[3]

After accepting jurisdiction, the Navy could relinquish all or part of the United States' legislative jurisdiction either by filing notice with the Governor of the Commonwealth or by complying with relinquishment provisions of Commonwealth law. 10 U.S.C. § 2685. Act of 1903 (providing that upon subsequent alienation of any land acquired thereby, "the People of Porto Rico shall again have jurisdiction thereover"); P.R.Laws Ann. tit. 28 § 57 (current version

**3.** At first blush, the simple requirements of Puerto Rico's Act of 1903 for the attachment of exclusive jurisdiction might seem to betray the purpose of § 255, which was enacted "to ensure that ... automatic cession statutes did not saddle the United States with unwanted jurisdiction." *Johnson,* 994 F.2d at 985. But the Court holds that the provision of Puerto Rico's Act of 1903 requiring the federal government to actually take possession of the land envisions a sufficiently affirmative action on the part of the United States to render Puerto Rico's Act of 1903 consistent with 40 U.S.C. § 255. Furthermore, as a simply practical matter, the Court can take judicial notice that the United States Navy exercises complete dominion over Roosevelt Roads Naval Base and has for many years. Clearly, both the United States and Puerto Rico governments appear in agreement that Roosevelt Roads is a federal enclave. In other words, the situation does not implicate the concerns underlying § 255—that jurisdiction would be foisted upon the federal government.

of Puerto Rico law governing reversion of lands from United States back to Puerto Rico). *See also Koedel,* 927 F.2d at 666. The Court can take judicial notice that the Navy has not formally relinquished control over Roosevelt Roads Naval Station, nor has the United States alienated the land on which it sits. Based on the above analysis, the federal government has exclusive legislative jurisdiction over the lands encompassing Roosevelt Roads Naval Station.

Plaintiff's reliance on *Cosme Nieves v. Deshler,* 786 F.2d 445 (1st Cir.1986) and *Sopena v. Colejon Corp.,* 920 F.Supp. 259 (D.Puerto Rico 1996) (J. Gierbolini) to the contrary is misplaced. Koren asserts that Judge Gierbolini held in *Sopena* that Puerto Rico's labor laws can apply in Roosevelt Roads. In analyzing *Sopena,* Plaintiff misunderstands Defendants' federal enclave argument and the difference between legislative and judicial jurisdiction. Part of that confusion probably arises from Defendants' use of the phrase "federal enclave jurisdiction." In both *Cosme Nieves* and *Sopena,* the courts were concerned with federal question jurisdiction, a form of *judicial* jurisdiction. In *Sopena,* Judge Gierbolini simply explained the principal of "federal enclave jurisdiction," whereby state law extant at the time of cession of exclusive legislative jurisdiction over a parcel of land by a state to the federal government still applies within the enclave until a federal law abrogates the state law. *James Stewart & Co. v. Sadrakula,* 309 U.S. 94, 99, 60 S.Ct. 431, 84 L.Ed. 596 (1940); *see also Paul v. United States,* 371 U.S. 245, 268, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963); *Chicago, R.I. & P.R. Co. v. McGlinn,* 114 U.S. 542, 5 S.Ct. 1005, 29 L.Ed. 270 (1885). Where this doctrine applies, the state law in effect at the time of transfer becomes part of the federal common law, and federal question jurisdiction, a form of *judicial* jurisdiction, exists over any disputes arising thereunder. *James Stewart & Co.,* 309 U.S. at 99; *Sopena,* 920 F.Supp. at 265. While the question of whether federal or local labor law applies to this case is indeed the central question of this portion of the Court's opinion and is indeed affected by the doctrines set forth in *James Stewart & Co., Sopena* does not rely on *James Stewart & Co.* for the proposition that Puerto Rico labor laws apply in Roosevelt Roads Naval Station. In fact, Judge Gierbolini strongly implied, albeit in dicta, that if Puerto Rico's labor laws applied at all in Roosevelt Roads, they would apply only as they stood when the United States accepted exclusive legislative jurisdiction over the base. 920 F.Supp. at 265.

Likewise, *Cosme Nieves* cannot be cited to support the application of Puerto Rico labor laws on military installations in Puerto Rico. Although the court in *Cosme Nieves* proceeded assuming that Puerto Rico's labor laws could apply on Fort Buchanan, it did so only in the context of upholding the district court's decision that federal employees are exempted from Puerto Rico's labor laws. 786 F.2d at 452–53. The *Cosme Nieves* court never reached the issue of exclusive federal legislative jurisdiction and never considered whether, under the federal enclave doctrine, Puerto Rico's labor laws remained applicable in U.S. military installations in Puerto Rico. Moreover, in light of *Koedel,* any notion that *Cosme Nieves* could support Plaintiff's position clearly lacks force. Roosevelt Roads is, and has been since long before 1980, an enclave of exclusive federal legislative jurisdiction.

### B. VIEQUES

■ As noted before, Koren claims to have worked under his contract with MMS in two locations outside of Roosevelt Roads: the naval facility on Pico del Este ("East Peak Facility") in the Caribbean National Forest ("El Yunque") and the naval facility on the island of Vieques.[4] Defendants loosely briefed the issue of jurisdiction in these locations; Plaintiff did not raise the issue at all. Although not specifically addressed in the record, the Court can infer from the parties' submissions that it is undisputed that Koren worked at the naval facilities located on Pico del Este and Vieques.

---

**4.** The record is unclear as to what portion of his time was spent in each of his various employ- ment venues.

The history of the naval facilities at Vieques was documented by the United States Court of Appeals for the First Circuit in *Romero–Barcelo v. Brown*, 643 F.2d 835, 838–840 (1981), *rev'd on other grounds*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). The Navy acquired title to most of its present holdings on Vieques in the early 1940's. *Id.* at 838. The Court takes judicial notice that the Navy still owns and possesses two-thirds of the island. Under the same analysis applied to Roosevelt Roads, if the land was acquired prior to July 27, 1945, the Secretary of War's proclamation of acceptance constituted formal acceptance of legislative jurisdiction under 40 U.S.C. § 255. Moreover, simply by acquiring title to and possessing the Vieques naval facilities prior to 1955, the Navy complied with Puerto Rico's then extant cession law of 1903, and, by doing so, acquired exclusive legislative jurisdiction under 40 U.S.C. § 255.

### C. PICO DEL ESTE

[7] Pico del Este, Spanish for East Peak, is a mountain located in El Yunque, or the Caribbean National Forest. There is a communications facility at the top of the mountain. By Interagency Agreement Between the Forest Service, United States Department of Agriculture and the Department of the Navy, Department of Defense ("Agreement")[5] made pursuant to Pub.L. 94–579 (1976), 36 C.F.R. § 251.50 et seq., the Navy occupies and uses the facility to operate a Guided Missile Operation Control Center. Agreement, preamble. Pursuant to the agreement, the Forest Service retains administrative control over the area on which the East Peak Facility is located. Agreement, ¶ 2.

5. The Agreement was signed on October 12, 1984 by the Navy and on November 28, 1984 by the Forest Service, United States Department of Agriculture. It supersedes a prior special use permit designated No. NOy(R)–53593 of June 30, 1960.

6. The Court thanks Demica Vigil, Supervisory Forester and Partnership Coordinator, United States Forest Service, United States Department of Agriculture, for assistance with the Land Status Map. The Court's research indicates that Spain first proclaimed El Yunque a Forest Reserve in 1876.

Reference to the Land Status Map of El Yunque Assembled January 1, 1948 ("Status Map"), which is currently in the custody of the Forest Service, establishes that the East Peak Facility is located on what was part of Spanish Crown lands—lands owned by the Spanish Crown—ceded to the United States under the Treaty of Paris in 1898.[6] The land was officially designated the Luquillo Forest Reserve on January 17, 1903 by Proclamation of President Theodore Roosevelt. East Peak was part of the land so designated. *See* Status Map. It was renamed Luquillo National Forest in 1907.[7] National Forests are under the dominion of the United States Department of Agriculture. 16 U.S.C. § 472. *See also, generally,* 16 U.S.C. §§ 471–583. But states do not lose their jurisdiction over national forests merely because such forests are established. 16 U.S.C. § 480. Therefore, Puerto Rico did not necessarily relinquish legislative jurisdiction over El Yunque simply because it became a national forest.

But the analysis of legislative jurisdiction over El Yunque cannot follow that applied to the Roosevelt Roads and Vieques naval stations. That is so because the United States did not acquire El Yunque by purchase or condemnation; the land was ceded to the United States by the Spanish Crown. Treaty of Paris, April 11, 1898, U.S.–Spain, arts. II and VIII,[8] *reprinted in* P.R.Laws Ann., Historical Documents. *See The People of Puerto Rico v. Municipality of San Juan*, 19 P.R. Dec. 656, 661 (1913) (In accordance with article 8 of the Treaty of Paris, the ownership of all lands which belonged to the Crown of Spain and had not been disposed of lawfully on December 10, 1898, when the said treaty was signed, passed to the United States of America). Since the treaty of Par-

7. In 1935, when an additional land purchase was incorporated, the forest reserve was given its present title, the "Caribbean National Forest."

8. Article VIII of the Treaty provides that Spain "cedes in Porto Rico ... all the buildings, wharves, barracks, forts, structures, public highways and other immovable property which, in conformity with the law, belong to the public domain, and as such belong to the Crown of Spain.

is, the United States has never relinquished its possession of El Yunque.

In 1900, the United States passed the Foraker Act, ch. 191 § 1, 31 Stat. 77 (April 12, 1900), also known as the Organic Act of 1900. By Section 13 of the Foraker Act, legislative authority over property acquired by the United States under the Treaty of Paris in:

any public bridges, road houses, water powers, highways, unnavigable streams, and the beds thereof, subterranean waters, mines, or minerals under the surface of private lands, and all property which at the time of the cession belonged, under the laws of Spain then in force, to the various harbor-works boards of Puerto Rico, and all the harbor shores, docks, slips, and reclaimed lands, but not including harbor areas or navigable waters, [was placed] under the control of the Government established by this act for the benefit of The People of Puerto Rico; and the Legislative Assembly hereby created shall have authority, subject to the limitations imposed upon all its acts to legislate with respect to all such matters as it may deem advisable.

Notably absent from the list of property over which the newly created insular Legislative Assembly was to exercise authority is any mention of the Caribbean National Forest or lands which would fairly describe the Caribbean National Forest.

In 1917, Congress enacted the Jones Act, Act of Mar. 2, 1917, ch. 145, 39 Stat. 951, also known as the Organic Act of 1917, replacing the Foraker Act. Section 7 of the Jones Act provided:

That all property which may have been acquired in Puerto Rico by the United States under the cession of Spain in the [Treaty of Paris] in any public bridges, road houses, water powers, highways, unnavigable streams and the beds thereof, subterranean waters, mines or minerals under the surface of private lands, all property which at the time of the cession belonged, under the laws of Spain then in force, to the various harbor works boards of Puerto Rico, all the harbor shores, docks, slips, reclaimed lands, and *all public lands and buildings not heretofore reserved by the United States for public purposes, is hereby placed under the control of the Government of Puerto Rico, to* be administered for the benefit of The People of Puerto Rico; and the Legislature of Puerto Rico shall have authority, subject to the limitations imposed upon all its acts, to legislate with respect to all such matters as it may deem advisable.

Jones Act, § 7 (emphasis added). Section 7 of the Jones Act generally recycled § 13 of the Foraker Act, but added to the list of lands over which the insular legislature would have authority "all public lands ... not heretofore reserved by the United States for public purposes." But as the Court has already noted, Spain first declared El Yunque a Forest Reserve in 1876, and in 1903 Theodore Roosevelt designated the Luquillo Forest Reserve, renamed in 1907 to the Luquillo National Forest. The lands of the national forest, including Pico del Este, were thereby "reserved by the United States for public purposes." Therefore, El Yunque was not transferred to the legislative jurisdiction of the Puerto Rico legislature under the Jones Act. *See Municipality of San Juan,* 19 P.R. Dec. at 661 (lands acquired by the United States from Spain under the Treaty of Paris which, *from their character, do not correspond to national ownership or have not been reserved expressly for national purposes,* have passed to the ownership of The People of Puerto Rico).

On June 4, 1951, the people of Puerto Rico, by referendum, voted to approve United States Pub.L. 81–600, 64 Stat. 314 (1950), entitled, "An Act to Provide for the Organization of a Constitutional Government by the People of Puerto Rico"; on March 3, 1952, after a draft was made by constitutional convention, the people of Puerto Rico adopted their constitution. *See* Pub.L. 82–447, 66 Stat. 327 (July 3, 1952), Joint Resolution Approving the Constitution of the Commonwealth of Puerto Rico. The United States approved the constitution, but with some conditions. *Id.* On July 10, 1952, the constitutional convention of Puerto Rico accepted the United States' conditions of approval, and made the necessary alterations. On July 25, 1952, Governor Luis Muñoz Marin, by resolution, inaugurated the Commonwealth of Puerto Rico. Under § 5 of United States Pub.L. 81–600, 64 Stat. 320 (1950), certain sections of the Jones Act were repealed, and the remaining sections were renamed to the

Puerto Rican Federal Relations Act, codified as revised at 48 U.S.C. §§ 731–874. Importantly for the Court's analysis, § 7 of the Jones Act remains in force even today as part of the Puerto Rican Federal Relations Act. After abstracting the history of possession of El Yunque, the Court finds that Pico del Este, as part of the Crown Lands ceded to the United States by Spain in the Treaty of Paris, has remained under the exclusive legislative dominion of the United States since the Treaty was ratified and has. not been under the jurisdiction of any other sovereign since that time.[9] In conclusion, the Court finds that each of the venues of Koren's employment is under exclusive federal legislative jurisdiction and has been since prior to 1980.

## III. CHOICE–OF–LAW

### A. *VIABILITY OF PUERTO RICO'S WAGE–AND–HOUR LAWS*

▮▮▮▮ The determination that Koren worked only on federal enclaves does not end

the matter of·whether Puerto Rico's labor laws apply to Koren. As discussed above, under the principle of "federal enclave jurisdiction," state law extant at the time of cession of exclusive legislative jurisdiction over a parcel of land by a state to the federal government still applies to the enclave until a federal law abrogates the state law. *James Stewart & Co.*, 309 U.S. at 99; *Sopena*, 920 F.Supp. at 265. Where this doctrine applies, the state law becomes part of the federal common law. *James Stewart & Co.*, 309 U.S. at 99. Thus, Puerto Rico's laws, as they existed at the time the United States took exclusive legislative jurisdiction, still apply to Roosevelt Roads and Vieques naval stations [10] unless abrogated by federal law.[11]

The Court holds that the FLSA, 29 U.S.C. §§ 201–219, along with the Federal wage-and-hour laws governing various federal government contracts, provides a sufficient legal framework to abrogate Puerto Rico's labor laws within both Roosevelt Roads and the

---

**9.** By this holding, the Court does not mean to say that no Puerto Rico laws apply within the boundary of El Yunque's former Crown Lands. Certain federal statutes serve to assimilate "local" laws on federal enclaves. *E.g.*, Assimilative Crimes Act:

> Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title (defining the special maritime and territorial jurisdiction of the United States), is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the States, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to punishment.

18 U.S.C. § 13 *amended by* Pub.L. 104–132, § 901(b)(1) 110 Stat. 1317 (1996). In their brief Defendants point out additional federal statutes that authorize the application of state law in areas of exclusive federal jurisdiction. The purpose of the Assimilative Crimes Act, like that of the federal enclave doctrine and other assimilative statutes, is "to conform the [ ] law of federal enclaves to that of local law." *United States v. Best*, 573 F.2d 1095, 1098 (9th Cir.1978) (citing *United States v. Sharpnack*, 355 U.S. 286, 289–95, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958)). "It has been described as a shorthand method of providing a set of [ ] laws on federal reservations by using local law to fill the gaps in federal [ ] law." *Id.* (citations omitted).

**10.** Because Puerto Rico has never had legislative jurisdiction over El Yunque, none of its laws apply therein unless assimilated by federal statute.

**11.** In this sense, the word "abrogation" is not a substitute for "preemption," as used in the constitutional sense. Preemption is a concept derived from the Supremacy Clause, Art. VI, cl. 2, of the United States Constitution, which states that federal law "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any ·State to the Contrary notwithstanding." Preemption renders null "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law." *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 67 (1st Cir.1997) (citing *Gade v. National Solid Wastes Mgmt. Ass'n.*, 505 U.S. 88, 108, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992)). Unless Congress expressly states an intention to preempt state law in the field, a court will not find that federal law preempts state law unless state law actually conflicts with federal law or the pervasiveness of the federal legal scheme, the dominance of the federal interest, or the federal goals and obligations reasonably permit an inference that Congress intended a federal law to occupy the field. *Id.* (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). The standard for abrogation under the federal enclave doctrine is less clearly defined—the Court analyzes that standard below.

Vieques naval facility. Federal courts have not specifically and thoroughly articulated a standard for answering the question of exactly when extant state laws fall by the wayside in a federal enclave. The notion that state laws continue in force in federal enclaves derives from seasoned rules of international law. As long ago as 1828, Justice Marshall wrote:

On such transfer of territory, it has never been held that the relations of the inhabitants with each other undergo any change. Their relations with their former sovereign are dissolved, and the new relations are created between them and the government which has acquired their territory. The same act which transfers their country, transfers the allegiance of those who remain in it; and the law, which may be denominated political, is necessarily changed, although that which regulates the intercourse, and general conduct of individuals, remains in force, until altered by the newly-created power of the State.

*American Ins. Co. v. 356 Bales of Cotton*, 26 U.S. (1 Pet.) 511, 542, 7 L.Ed. 242 (1828) (relating to law of recently ceded territory of Florida). Nearly sixty years later, the Court applied the principal articulated by Justice Marshall to a newly created federal enclave ceded by a state. In *Chicago, Rock Island and Pacific Ry. Co. v. McGlinn*, 114 U.S. 542, 546, 5 S.Ct. 1005, 29 L.Ed. 270 (1885), the Court addressed the question of whether Kansas law became inoperative within the territory of Fort Leavenworth upon Kansas' cession of that territory to the exclusive jurisdiction of the United States. Justice Field wrote:

It is a general rule of public law, recognized and acted upon by the United States, that whenever political jurisdiction and legislative power over any territory are transferred from one nation or sovereign to another, the municipal laws of the country, that is, laws which are intended for the protection of private rights, continue in force until abrogated or changed by the new government or sovereign ... As a matter of course, all laws, ordinances and regulations in conflict with the political character, institutions and Constitution of the new government are at once displaced.

Thus, upon a cession of political jurisdiction and legislative power—and the latter is involved in the former—to the United States, the laws of the country in support of an established religion or abridging the freedom of the press, or authorizing cruel and unusual punishments, and the like, would at once cease to be of obligatory force without any declaration to that effect; and the laws of the country on other subjects would necessarily be superseded by existing laws of the new government upon the same matters. But with respect to other laws affecting the possession, use and transfer of property, and designed to secure good order and peace in the community, and promote its health and prosperity, which are strictly of a municipal character, the rule is general, that a change of government leaves them in force until, by direct action of the new government, they are altered or repealed.

*Id.* at 546–47. The Court again visited the issue, nearly half a century later, when it upheld the application of a New York labor safety law to a post-office construction site that had been transferred to the exclusive jurisdiction of the United States. *See James Stewart & Co.*, 309 U.S. 94, 105, 60 S.Ct. 431, 84 L.Ed. 596. In *James Stewart & Co.*, the Court elucidated the purpose of the rule: to "assure[ ] that no area however small will be left without a developed legal system for private rights." 309 U.S. at 100. Additionally, the Court noted the desirability of "similarity between the municipal laws of the state and the federal parcel." *Id.* (citing numerous federal statutes "leav[ing] largely unimpaired the civil and criminal authority of the state over national reservations or properties"). With respect to when the state laws became inoperable, the Court first noted that "only the law in effect at the time of the transfer of jurisdiction continues in force, [and] future statutes of the state are not a part of the body of laws in the ceded area." *Id.; see also Pacific Coast Dairy, Inc. v. Dept. of Agric. of California*, 318 U.S. 285, 294, 63 S.Ct. 628, 87 L.Ed. 761 (1943). For this reason, "Congressional action is necessary to keep it current, [and] consequently, as defects become apparent legislation is enacted

covering certain phases." *James Stewart & Co.*, 309 U.S. at 100. The Court next noted that even if portions or aspects of a state law are rendered ineffective in a federal enclave, it does not necessarily follow that the remaining portions are unenforceable. *Id.* 102–103; *but see Murray v. Joe Gerrick & Co.*, 291 U.S. 315, 319, 54 S.Ct. 432, 78 L.Ed. 821 (1934) ("If it were held that beneficiaries may sue, pursuant to the compensation law, we should have the incongruous situation that this law is in part effective and in part ineffective within the area under the jurisdiction of the federal government. Congress did not intend such a result.") and *Paul v. United States*, 371 U.S. 245, 269, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963) (state regulations promulgated after cession/transfer of jurisdiction may apply to the enclave, so long as "the basic state law authorizing such control has been in effect since the time of acquisition"). According to *James Stewart & Co.*, the limiting factor on application of state law in force at the time of transfer to a federal enclave is simply that "the authority of state laws or their administration may not interfere with the carrying out of a national purpose." 309 U.S. at 103 (citations omitted). Therefore, "where the enforcement of the state law would handicap efforts to carry out the plans of the United States, the state enactment must, of course give way." *Id.* at 103–104.

■ While most courts that have addressed the issue of federal enclave jurisdiction have utilized this "interference" standard, this Court believes that other circumstances might exist that would support a conclusion that the state's laws, as they existed at the time of cession, should not apply. Particularly important for purposes of this case is the state's subsequent treatment of the law. For example, the Court believes it would be discrepant to apply today to a federal enclave acquired in 1955 a state law enacted in 1917 if the state itself repealed that law in 1956. Such a situation would detract from one of the justifications for the doctrine—uniformity between the laws of the state and the federal parcel.

Id. at 100. And if the other justification—filling the gaps in the legal framework operable within the federal parcel—was also not implicated, regardless of whether applying the repealed law would or would not "interfere" with the federal mission, application of the state law would simply be unprincipled. Other circumstances in any given case might create additional concerns militating against the continued application of state laws on federal enclaves even where no direct or concrete conflict exists between the state and federal laws or policy. In other words, the determination of the vitality of any state law within any federal enclave must be undertaken on a case-by-case basis, and factors other than the direct conflict of the state and federal law may control the inquiry.

With this in mind, the Court proceeds to look at Puerto Rico's wage-and-hour laws. The Puerto Rico Minimum Wage Laws, codified at P.R.Laws Ann. tit. 29 §§ 245–246, were amended on June 26, 1956.[12] Those amendments do not apply to any of the federal enclaves at issue here because jurisdiction over each had ceded to the federal government prior to 1956. The Commonwealth law governing working hours and days has likewise undergone substantial revision. That portion of Puerto Rico's wage-and-hour laws, codified at P.R.Laws Ann. tit. 29 §§ 271–299, was enacted in 1948, and has since been revised. *E.g.*, 1974 P.R.Laws Act of July 23, No. 223, Pt. 2, p. 161, § 8 (calling for gradual reduction of work week from 48 to 40 hours). As Judge Gierbolini noted in *Sopena*, "Puerto Rico Law No. 379, as it existed prior to 1955, merely required overtime pay for hours worked in excess of eight (8) during any period of twenty-four (24) consecutive hours or in excess of forty-eight (48) hours during any week." *Sopena*, 920 F.Supp. at 265.

In light of the substantial changes Puerto Rico's wage-and-hour laws have undergone and the difficulty of even establishing the exact dates on which legislative jurisdiction over Roosevelt Roads and Vieques vested in

---

**12.** The new Act of June 26, 1956, No. 96, p. 622, contained a savings clause, codified at P.R.Laws Ann. tit. 29 § 246k, stating that all actions of the Minimum Wage Board taken under the old law, Act of April 5, 1941, No. 8, remained in force.

the federal government, the Court holds that continued application of those laws would be illogical, unworkable, and simply unfair. First, it would run counter to the goal of uniformity between the laws governing the Commonwealth and those governing the federal enclaves. Second, demanding employers in those enclaves to educate themselves on the state of Puerto Rico's wage-and-hour laws as of the dates that jurisdiction over those enclaves ceded to the United States would place an enormous and unrealistic burden on such employers. Third, the Court doubts the Minimum Wage Board's power to continue to regulate labor in the federal enclaves, leaving a regulatory gap underlying application of the repealed status.[13] Finally, as Puerto Rico's laws stood when Roosevelt Roads and Vieques Naval Bases were acquired by the United States, they would almost certainly be less favorable to employees than current federal labor laws. For example, the FLSA mandates a workweek of 40 hours, while Puerto Rico's wage-and-hour law, as of the time the federal government took jurisdiction over the revelant federal enclaves, mandated a 48–hour work week. Moreover, the federal wage-and-hour laws governing overtime are sufficiently comprehensive that abandonment of Puerto Rico's old version of Law 379 does not leave anyone in Puerto Rico's federal enclaves who is covered by the FLSA "without a developed legal system." *See* 29 U.S.C. §§ 207 (maximum hours), 213 (exemptions), 215 (prohibited acts), 216 (penalties and liability). The abro-

gation of Puerto Rico's labor laws in Roosevelt Roads and Vieques does raise one legitimate and major concern—some employees toiling therein who would be covered by Puerto Rico's labor laws might not be covered by federal labor laws. While the possibility of this unsatisfying result is real, the Court does not believe it justifies the application of Puerto Rico's hoary wage-and-hour laws in light of the difficulties outlined above. In conclusion, the Court finds that continued application of Puerto Rico's wage-and-hour laws to Roosevelt Roads and/or the naval facilities in Vieques is not justified under the federal enclave doctrine.

Additionally, any reliance on 29 U.S.C. § 218(a) for the proposition that Puerto Rico's labor laws, as they stand today, should apply to the federal enclaves is misplaced.[14] That is so because, by definition, no state law exists in an enclave of exclusive federal legislative jurisdiction. Even if state law were found to apply under the doctrine set forth in *James Stewart & Co.*, that state law does not exist *qua* state law, but is transformed into federal common law. *James Stewart & Co.* at 97–99 ("the [state] statute remains effective as a statute of the United States" and "the [state law] continues as a part of the laws of the federal territory"). In sum, the Court holds that Puerto Rico's wage-and-hour laws have no application within the federal enclaves in which Koren worked under his contract with MMS.[15]

13. Because the Court does not rest solely on this issue, the Court will not undertake the complex task of analyzing the Minimum Wage Board's ability to promulgate regulations under now repealed or amended laws that would govern labor within the federal enclaves.

14. Twenty–Nine U.S.C. § 218(a) states, in pertinent part, that no provision of the federal wage-and-hour laws "shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter or a maximum workweek lower than the maximum workweek established under this chapter."

15. Defendants have briefed additional arguments for suspending application of Puerto Rico's labor laws in Roosevelt Roads, Vieques, and Pico del Este. First, Defendant discussed the extraterritorial effect of Puerto Rico's labor laws, arguing that Puerto Rico's wage-and-hour requirements

do not extend beyond the Commonwealth's territorial limits. *Green Giant Co. & Saint Paul Fire and Marine Ins. Co. v. Tribunal Superior*, 104 P.R. Dec. 489, 496, Off. Trans. 682, 697, 1975 WL 38682 (1975); *cf. Sandor Garcia v. American Airlines*, Inc., 12 F.3d 308, 313 (1st Cir.1993) (relying on Puerto Rico's Secretary of Justice's Opinion that flight attendants who perform more than 50% of their work outside of Puerto Rico are not protected by Puerto Rico's labor laws, Op. Sec. Just., No.1977–22, Trans. (Oct. 21, 19977); Letter of Dec. 28, 1977, Trans., in which Secretary in turn relied on Puerto Rico and United States Supreme Court jurisprudence to the effect that job situs is fundamental and determinative with respect of applicability of labor laws). The Court has already concluded that the United States has exclusive legislative jurisdiction in the various federal enclaves in which Koren worked, and that Puerto Rico's wage-and-hour laws do not govern in those enclaves. But Defendants also mention the Virgin Islands and "at sea" in

## B. APPLICABILITY OF VARIOUS FEDERAL STATUTES

Having determined that local wage-and-hour laws do not apply, the Court is faced with choosing from among certain potentially applicable federal statutes: the FLSA, 29 U.S.C. §§ 201–219, the Federal Service Contract Act ("SCA"), 41 U.S.C. §§ 351–358, and the Contract Work Hours and Safety Standards Act ("SSA"), 40 U.S.C. §§ 327–333.

### 1. The Fair Labor Standards Act

 The FLSA was enacted under Congress Commerce Clause powers. 29 U.S.C. § 202(b). The Act was designed to prescribe minimum standards for working conditions in those industries within its scope. *See Mitchell v. Robert DeMario Jewelry, Inc.* 361 U.S. 288, 292, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960). The FLSA requires that "every employer shall pay to each of his employees who in an workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce" minimum wage rates. 29 U.S.C. § 206; *Donovan v. Agnew,* 712 F.2d 1509, 1514 (1st Cir.1983). Commerce is defined as "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." 29 U.S.C. § 203(b). The language of § 206 creates two means by which an employee may be subject to protection under the FLSA—either individually or through his employer. *Brennan v. Arnheim & Neely, Inc.,* 410 U.S. 512, 516–17, 93 S.Ct. 1138, 35

L.Ed.2d 463 (1973); *Reich v. Stewart,* 121 F.3d 400, 405 (8th Cir.1997); *Zorich v. Long Beach Fire Dep't and Ambulance Serv., Inc.,* 118 F.3d 682, 684–685 (9th Cir.1997). In other words, both employees directly engaged in commerce or in the production of goods for commerce and employees of "enterprises engaged in interstate commerce" enjoy the FLSA's protections. *Zorich,* 118 F.3d at 684.

 The test to determine whether an employee is individually engaged in commerce within the meaning of the FLSA is "whether the [employee's] work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated, local activity." *Mitchell v. C.W. Vollmer & Co.,* 349 U.S. 427, 429, 75 S.Ct. 860, 99 L.Ed. 1196 (1955). The inquiry focuses "on the activities of the employee and not on the business of the employer." *Mitchell v. Lublin, McGaughy & Assocs.,* 358 U.S. 207, 211, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959). While the FLSA's coverage was designed to exclude "employees whose activities merely 'affect commerce'" and therefore is not "coextensive with [Congress'] power to regulate commerce, ... the Act has been construed liberally to apply to the furthest reaches consistent with congressional direction." *Id.* The inquiry is clearly factual, and the Court has a limited evidentiary basis for making a specific determination as to whether Koren was engaged in commerce. Without actually reaching a holding, the

---

their brief, implying that Koren worked in those locations. Koren's Amended Complaint specifies only that he "worked for defendant at different parts of the Roosevelt Roads Base, Vieques and El Yunque." Based on the Amended Complaint, the Court will proceed in the understanding that Plaintiff did not work in places aside from Roosevelt Roads, Vieques, and El Yunque. As the Court has already determined that Puerto Rico's wage-and-hour laws do not apply in those locations, the Court will not address Defendants' extraterritoriality argument.

Defendants also assert that Section 18(a) of the FLSA does not render Puerto Rico's wage-and-hour laws extraterritorially applicable. The Court has already addressed the issue and agrees with Defendants.

Defendants also argue that "federal activities" and/or federal installations are immune from state law regulation. Without expressing an opinion as to the merits of that argument in this case, the Court notes that the argument relies on factual determinations for which no evidence has been proffered and that the complex issues implicated by Defendants' argument have been inadequately briefed. Moreover, based on the Court's holding that the Commonwealth's wage-and-hour laws do not apply within the federal enclaves in which Koren worked, the issue is moot.

Finally, MMS argues that Puerto Rico's wage-and-hour laws are preempted by the Service Contract Act, 41 U.S.C. §§ 351–358. Again, as the Court has concluded that Puerto Rico's wage-and-hour laws do not apply to Plaintiff's employment with MMS, the Court will not undertake the complicated preemption analysis.

Court notes that the range of employees individually covered is broad. *See, Schultz v. Merriman,* 303 F.Supp. 1174, 1176 (D.N.H. 1969) (Bownes, J.), *affirmed as modified,* 425 F.2d 228 (1st Cir.1970); *but see generally Central Aguirre Sugar Co. v. Castro,* 330 F.2d 68 (1st Cir.1964). Presently, however, the Court cannot determine, as a matter of law, whether Koren qualifies for protection under the FLSA under the individual employee test.

Even if Koren's work does not qualify him individually for protection under the FSLA, he may secure FLSA protection if MMS is an enterprise engaged in interstate commerce. In 1961, Congress expanded the FLSA's protection through the concept of enterprise coverage.[16] Enterprise coverage is defined by the FLSA to cover:

> [Every] enterprise which has employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person, and which ... is an enterprise ... whose annual gross volume of sales made or business done is not less than $250,-000 [17]

29 U.S.C. § 203(s)(1) (amended by Pub.L. 101–157 § 3(e), 103 Stat. 938–41 (1989)). Again, the records lacks the evidence necessary for the Court to determine whether Koren is sheltered by the FLSA by virtue of MMS's status as a covered enterprise.

### 2. The Service Contract Act

In 1965, Congress enacted the Service Contract Act "to provide labor standards for the protection of employees of contractors and subcontractors furnishing services to or performing maintenance service for Federal agencies." S.Rep. 89–748 (1965), *reprinted in* 41 U.S.C.A. at 463–64 (West 1987). "The service contract [was] the only remaining category of Federal contracts to which no labor standards protection applies." *Id.* The SCA requires, in pertinent part, that:

> (a) Every contract ... entered into by the United States ... in excess of $2,500 ... the principal purpose of which is to furnish services in the United States through the use of service employees, shall contain the following:
>
> (1) A provision specifying the minimum monetary wages to be paid the various classes of service employees in the performance of the contract ... as determined by the Secretary [of the Department of Labor] ... in accordance with prevailing rates for such employees in the locality ... In no case shall such wages be lower than the minimum specified in subsection (b) of this section.
>
> (b) No contractor who enters into any contract with the Federal Government the principal purpose of which is to furnish services through the use of service employees ... shall pay any of his employees engaged in performing work in such contracts less than the minimum wage specified under section 206(a)(1) of Title 29.

Defendants assert that MMS had a service contract with the Navy and that Koren's wages and benefits were "extensively regulated by the Service Contract Act." Although that assertion seems likely, the Court has not been provided any evidence to support it, such as a copy of the contracts between MMS and the Navy in force while Koren claims he was not paid in compliance with relevant wage-and-hour laws.

Defendants correctly point out that the SCA provides no private cause of action to employees working under an SCA-governed contract; such employees are limited to administrative remedies. *See United States ex rel. Sutton v. Double Day Office Servs., Inc.,* 121 F.3d 531, 533 (9th Cir.1997);

---

16. "The FLSA originally protected only employees who individually qualified for coverage—employees who were 'engaged in commerce or the production of goods for commerce.'" *Zorich,* 118 F.3d at 684. "The effect of the 1961 change was to extend protection to the fellow employees of any employee who would not have been protected by the original Act, but not to enlarge the class of employers subject to the Act." *Maryland v. Wirtz,* 392 U.S. 183, 188, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968).

17. Effective April 1, 1990, the amount increased to $500,000. Pub.L. 101–157, § 3(e), 103 Stat. 938–41 (1989), codified at 29 U.S.C. § 203(s)(1)(A)(ii).

*Lee v. Flightsafety Servs. Corp.*, 20 F.3d 428, 431 (11th Cir.1994); and *Danielsen v. Burnside–Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1228 (D.C.Cir.1991). That does not mean, however, that the SCA has preempted the service contract field in the constitutional sense. In *Danielsen*, the Court specifically eschewed using the word "preempted" when it upheld the district court's holding that an employee could not enforce the SCA by utilizing a RICO claim. 941 F.2d at 1227. In *Lee*, the Eleventh Circuit held that the FLSA and the SCA are not mutually exclusive and may both apply to a given case if not in conflict. 20 F.3d at 431. The fact that the FLSA provides a private remedy does not create a conflict with the SCA, and where a plaintiff states a claim under the FLSA alleging that her employer failed to properly compensate her, there is no conflict to bar that claim. *Id.; see also Masters v. Maryland Mgmt.*, 493 F.2d 1329, 1332 (4th Cir.1974); *cf. United States ex rel. Sutton*, 121 F.3d at 533–34 (use of the *qui tam* provision of the False Claims Act to redress violation of SCA permitted).

### 3. Contract Work Hours and Safety Standards Act

██ The Contract Work Hours and Safety Standards Act:

appl[ies] ... to any contract which may require or involve the employment of laborers or mechanics upon a public work of the United States, [or] any territory ... and to any other contract which may require or involve the employment of laborers or mechanics if such contract is one (1) to which the United States or any agency or instrumentality thereof ... is a party ... Except as otherwise expressly provided, the provisions of this subchapter shall apply to all laborers and mechanics, including watchmen and guards, employed by any contractor or subcontractor in the performance of any part of the work contemplated by any such contract.

40 U.S.C. § 329(a). If the SSA applies to Koren, it, too, would regulate his wages and hours:

Notwithstanding any other provision of law, the wages of every laborer and mechanic employed by any contractor or subcontractor in his performance of work on any contract of the character specified in section 329 of this title shall be computed on the basis of a standard workweek of forty hours, and work in excess of such standard workweek shall be permitted subject to provisions of this section. For each workweek in which any such laborer or mechanic is so employed such wages shall included compensation, at a rate not less than one and one-half times the basic rate of pay [18], for all hours worked in excess of forty hours in the workweek.

Like the SCA, the SSA does not provide employees working under SSA-governed contracts with a private right of action. 40 U.S.C. § 330; *see Sopena*, 920 F.Supp. at 265. But also like the SCA, courts have construed the SSA to apply in tandem with the FLSA, not to its exclusion. *Masters*, 493 F.2d at 1332; *Mitchell v. Empire Gas*, 256 F.2d 781 (5th Cir.1958) (SSA supplemental to FLSA). *Cf.* 29 C.F.R. § 778.5 ("where such legislation is applicable and does not contravene the requirements of the FLSA, nothing should be taken to override or nullify the provisions of those laws"); *Powell v. Cartridge Co.*, 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017 (1950) (Walsh–Healy Act and FLSA mutually supplementary).

Having concisely canvassed the potentially applicable federal statutes, the Court finds that it cannot determine which apply based on the existing record. Therefore, the Court hereby **ORDERS** the parties to brief the issue of the applicability of the FLSA, the SCA, and the SSA to Koren's employment with MMS (the parties' briefs are to assume that Koren is not exempted as a professional or administrator) on or before February 13, 1998. The parties are to support their briefs with competent evidence.

---

**18.** Although undefined by the statute, the basic rate of pay has been judicially defined as synonymous with "regular rate" under the FLSA. *Mas-*

*ters v. Maryland Mgmt. Co.*, 493 F.2d 1329, 1333 (4th Cir.1974) (relying on 29 C.F.R. § 4.15(c)(1) and (2)).

## IV. PROFESSIONAL AND/OR ADMINISTRATOR

The parties have spent considerable effort arguing whether or not Koren qualifies as an administrator or professional for the purposes of the various wage-and-hour laws. *See* P.R.Stat.Ann. tit. 29 § 246e(b) ("The provisions of section 245 et seq. of this title shall not apply to managers, executives, and professionals. The Board shall define said terms by regulation."); P.R.Stat.Ann. tit. 29 § 299 ("employee shall not be understood, however, to mean professionals, executives and administrators"); 29 U.S.C. § 213(a)(1) ("The provisions of section 206 (except subsection (d) in the case of paragraph (1) of this subsection) and section 207 of [the FLSA] shall not apply with respect to any employee employed in a bona fide executive, administrative, or professional capacity."); 40 U.S.C. § 328 (SSA applies only to laborers and mechanics); 41 U.S.C. § 357(b) ("The term 'service employee' means any person engaged in the performance of a contract entered into by the United States and not exempted under section 356 of this title, whether negotiated or advertised, the principal purpose of which is to furnish services in the United States (other than any person employed in a bona fide executive, administrative, or professional capacity, as those terms are defined in part 541 of Title 29, Code of Federal Regulations, as of July 30, 1976, and any subsequent revision of those regulations)"). The parties' arguments are not supported by competent evidence, however, and the Court cannot determine, as a matter of law, that Koren was employed as an administrator and/or professional. Therefore, the Court hereby **ORDERS** the parties to brief the issue again, and to include exhibits of competent evidence in support of any and all factual asseverations they make. Of course, if Defendants concede that genuine disputes of material fact exist regarding Koren's status as an administrator or professional, such that summary judgment would not be appropriate

(and the Court suspects such disputes exist), they need not waste their money and the Court's time addressing the issue. If Defendants choose not to submit a brief on the issue, they are instructed to inform Plaintiff's counsel on or before January 19, 1998, so that he does not waste his efforts on a moot issue.

IT IS SO ORDERED.

### *ORDER*

## I. INTRODUCTION

Plaintiff Alfred Koren ("Koren") brings this action under various federal [19] wage-and-hour laws, seeking compensation for overtime work he performed for his employer, Martin Marietta Services, Inc. ("MMS"), from 1980 until 1992. MMS was a federal contractor during those years supplying management, operational, and support services to the United States Navy in connection with the operation of its Atlantic Fleet Weapons Training Facility. Koren was employed under MMS's contract with the Navy. His employment was potentially governed by several federal wage-and-hour statutes—the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–19, the Federal Service Contract Act ("SCA"), 41 U.S.C. §§ 351–58, and the Contract Work Hours and Safety Standards Act ("CWHSSA"), 40 U.S.C. §§ 327–33. Defendants previously argued that the SCA and/or CWHSSA governed Koren's employment and that the FLSA did not apply. The Court was unable to resolve the issue because the parties had produced insufficient evidence from which the Court could determine, as a matter of law, which of the federal statutes apply to this case and which do not. Therefore, the Court instructed the parties to brief the issue and attach all necessary evidence to support their positions regarding the applicability of the three federal statutes.[20]

---

**19.** The Court dismissed Plaintiff's claims under Puerto Rico wage-and-hour laws, because Plaintiff was employed solely in federal enclaves under exclusive federal legislative jurisdiction. See Court's Order of October 15, 1997.

**20.** As the Court has already determined that local law does not govern Koren's case against MMS, Koren's present discussion of meal-time compensation is irrelevant—none of the potentially applicable federal statutes require special meal-time compensation.

The parties have submitted their respective briefs. Both agree that the CWHSSA and SCA govern Koren's employment with MMS. Opinions differ with respect to the FLSA, however. Defendants argue that courts should not permit employees like Koren to bring private suits under the FLSA where the SCA and/or the CWHSSA apply. According to Defendants, where the SCA's and/or the CWHSSA's provisions already protect an employee, permitting that employee to bring suit under the FLSA, which provides a private cause of action, would undermine the SCA and/or CWHSSA, which envision administrative enforcement.[21]

## II. ANALYSIS

### A. IMPLIED REPEAL

▮▮▮▮▮ The issue before the Court— whether a specific remedy provided by a narrow, specifically directed statute, the SCA and/or CWHSSA in this case, precludes the use of a different remedy provided by a more general statute, the FLSA in this case— requires the Court to determine whether the specific statutes impliedly repeal the general statute. "It is, of course, a cardinal principle of statutory construction that repeals by implication are not favored." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976) (quoting *United States v. United Continental Tuna Corp.*, 425 U.S. 164, 168, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976)). "When two statutes are capable of co-existence, it is the duty of the courts ... to regard each as effective." *Id.* (quoting *Morton v. Mancari*, 417 U.S. 535, 549–50, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)). "Redundancies across statutes are not unusual events in drafting, and so long as there is no 'positive repugnancy' between two laws, a court must give effect to both." *Id.* (quoting *Wood v. United States*, 41 U.S. (16 Pet.) 342,

363, 10 L.Ed. 987 (1842)). But even though implied repudiation is clearly a disfavored phenomenon, the Supreme Court has always recognized that one statute might impliedly repeal another under certain circumstances:

> "There are ... two well-settled categories of repeals by implication (1) where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act. But in either case, the intention of the legislature to repeal must be clear and manifest."

*Id.* (quoting *Posadas v. National City Bank*, 296 U.S. 497, 503, 56 S.Ct. 349, 80 L.Ed. 351 (1936)).

Nearly fifty years ago, the Supreme Court addressed an issue essentially identical to that posed by Defendants' today. In *Powell v. United States Cartridge Co.*, the Court held that the Walsh–Healy Act governing overtime pay for employees working under government supply contracts did not render the FLSA inapplicable. 339 U.S. 497, 515–519, 70 S.Ct. 755, 94 L.Ed. 1017 (1950). In *Powell*, employees of a government contractor sued for overtime pay under the FLSA, and the contractor argued that the FLSA could not apply, because its contract was expressly governed by the Walsh–Healy Act. The Court disagreed and refused to hold that the Walsh–Healy Act had impliedly repealed part of the FLSA. First, the Court compared the two statutes, noting that "the Walsh–Healy Act kept within a narrow field," while the FLSA "presented a different and broader approach." *Id.* at 516. The FLSA "declared its purpose in bold and sweeping

---

21. Defendants have not argued that Koren is not protected by the FLSA either because MMS does not qualify as a covered enterprise or because Koren's work while at MMS did not require him to engage in commerce. *See Brennan v. Arnheim & Neely, Inc.*, 410 U.S. 512, 516–17, 93 S.Ct. 1138, 35 L.Ed.2d 463 (1973); *Zorich v. Long Beach Fire Dept. & Ambulance Serv., Inc.*, 118 F.3d 682, 684–85 (9th Cir.1997). The Court, having instructed the parties to brief the issue of whether Koren is protected by the FLSA and having thoroughly expounded upon the issue of the FLSA's commerce-related requirements, will assume that Defendants' failure to address the issue amounts to an admission either that Koren engaged in interstate commerce or that MMS qualified as a covered entity for the purposes of the FLSA. Thus, the sole dispositive legal issue remaining is whether application of the FLSA is barred by application of the SCA and/or the CWHSSA.

terms . . . breadth of coverage was vital to its mission . . . its scope was stated in terms of substantial universality amply broad enough to include employees of private contractors working on public projects as well as on private projects." *Id.* at 516–17. Although the Court found "evidence that the two statutes define[d] overlapping areas," it refused to restrict the application of either in the absence of any demonstration that compliance with one act made compliance with the other impossible. *Id.* at 517–518. In reaching its holding, the Court actually noted that the FLSA's remedial procedures were more favorable than the Walsh–Healy Act's.[22] *Id.* at 519. Instead of finding that to be a reason to preclude application of the FLSA's remedial provisions—as urged by Defendants in the case at bar—the Court considered it a reason for holding that the Walsh–Healy Act and the FLSA are "mutually supplementary." *Id.* at 519–520. This Court now turns to the specific statutes at hand and applies the jurisprudence regarding implied repeal.

### B. APPLYING THE FAIR LABOR STANDARDS ACT IN CONJUNCTION WITH THE SERVICE CONTRACT ACT

■ The FLSA was implemented to correct and eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202. The FLSA contains minimum wage and maximum workweek/overtime provisions. It furnishes a private cause of action for employees against employers that have violated its provisions, including the wage-and-hour provisions. 29 U.S.C. § 216(b). The FLSA is a generally applicable[23] statute enacted pursuant to Congress' Commerce Clause powers. 29 U.S.C. § 202(b). It only protects employees "engaged in commerce or the production of

goods for commerce or [ ] employed in an enterprise engaged in commerce or the production of goods for commerce." 29 U.S.C. § 206(a); 207(a).

The Service Contract Act was enacted "to provide labor standards for the protection of employees of contractors and subcontractors furnishing services to or performing maintenance service for Federal agencies." S.Rep. 89–748 (1965), *reprinted in* 41 U.S.C.A. at 463–64 (West 1987). At the time of its enactment, "the service contract [was] the only remaining category of Federal contracts to which no labor standards protection applie[d]." *Id.* The SCA operates in a completely different manner than the FLSA. As opposed to the FLSA, which provides a single minimum wage that applies, for the most part, across the board to any and all covered employees, the SCA utilizes an extensive regulatory scheme for the determination of wage rates for various types of employees based on wage rates in the locality where the work is being performed. The wage rates are determined by the Secretary of Labor, and any contract governed by the SCA must contain "a provision specifying the minimum monetary wages to be paid the various classes of service employees." 41 U.S.C. § 351(a)(1).[24] The SCA does not provide either for a maximum work week or overtime pay. 29 C.F.R. § 4.180. The courts that have addressed the issue have unanimously determined that the SCA does not create a private cause of action for employees working under contracts governed by the Act. *United States ex rel. Sutton v. Double Day Office Servs., Inc.*, 121 F.3d 531, 532 (9th Cir.1997); *Danielsen v. Burnside–Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1228 (D.C.Cir.1991); *District Lodge No. 166, Intern. Assoc. of Mach. v. TWA*, 731 F.2d 711, 714–16 (11th Cir.1984); *Miscellaneous Serv. Workers, Drivers, & Helpers, Teamsters Local #427 v. Philco–Ford Corp.*, 661 F.2d 776, 781 (9th

22. The Walsh–Healy Act, like the SCA and the CWHSSA, provided for administrative remedies and no private right of action. *See* 41 U.S.C. § 36.

23. Congress has, over time, carved out exceptions to the a FLSA's protections. But aside from the listed exceptions, the statutes remains

generally applicable; its application is not limited to particular fields, contracts, employers, etc.

24. Such contracts must also contain "a provision specifying the fringe benefits to be furnished the various classes [of service employees]." 41 U.S.C. § 351(a)(2). Koren's Complaint does not implicate fringe benefits, however.

Cir.1981). Instead, the SCA provides for an administrative remedy.[25]

The SCA does not expressly repeal the FLSA in any measure. Indeed, the SCA specifically incorporates aspects of the FLSA. For example, the SCA states that no employee working pursuant to a service contract may be paid less than the minimum wage established by the FLSA, regardless of any wage determinations made by the Secretary. 41 U.S.C. § 351(b)(1). Defendants argue, however, that the FLSA has been impliedly repealed to the extent it might provide a private cause of action for violations of its provisions to any employees working under a contract governed by the SCA. Essentially, Defendants' argue that, in enacting the SCA with its exclusive administrative remedy, Congress intended to have claims by employees of government contractors resolved administratively by the Department of Labor, and that permitting overlap by the FLSA's more favorable remedial provisions would undermine Congress' will and render the SCA's administrative remedy superfluous. Defendants' argument does not hold water.

First, Defendants misstate Congress' goal in enacting the SCA. Although Defendants' brief makes assertions as to Congress' "undoubted intent" to have cases such as Koren's resolved administratively, it points to no authority in support of those assertions. In fact, contrary to Defendants' assertions, the legislative history clearly states that Congress' goal "in passing the [SCA was to] close a gap in the otherwise comprehensive net of federal contract legislation." *Menlo Serv. Corp. v. United States,* 765 F.2d 805, 809 (9th Cir.1985). The idea was to protect the employees of government contractors working under contracts not otherwise governed by federal wage-and-hour laws; Congress' goal was not to protect the contractors themselves. Defendants' argument is therefore incorrectly premised on the faulty notion that Congress, in providing a limited, administrative remedy, was attempting to protect the contractors by "excluding conflicting remedies." As Defendant' mistaken view of Congress' intent forms the major premise of

their position, unveiling the fallacy of their view rips the heart out of their argument. For it makes no sense to conclude that Congress intended the SCA—the goal of which is the protection of employees of government contractors—to destroy the availability of other federal remedies that ensure similar protection for some of those same employees. *Cf. United States v. General Dynamics Corp.,* 19 F.3d 770, 774–75 (2d Cir.1994) (holding that the Anti Kickback Act of 1985 did not preempt remedies available under the False Claims Act and finding that it would be anomalous to conclude that legislation designed to combat illegal kickbacks would be intended to weaken the availability of other federal remedies designed to combat illegal kickbacks).

Second, Defendant's argument that the administrative remedies set forth by the SCA would be rendered useless if employees such as Koren were permitted to sue under the FLSA is simply incorrect. For one thing, the SCA protects employees who are not necessarily protected by the FLSA. In part, that is so because the FLSA was passed under Congress' Commerce Clause powers, and the SCA, as it governs governmental spending, is not limited by any nexus with interstate commerce. In conformity with constitutional limitations place on Congress' powers under the Commerce Clause, the FLSA is statutorily limited to employees engaged in commerce or working for an enterprise engaged in commerce whose gross volume of sales is not less than $500,000. 29 U.S.C. § 203(s)(1). The SCA does not contain these limitations. Therefore, the SCA may protect employees that the FLSA does not. In addition to protecting workers who may not be covered by the FLSA, the SCA's wage setting provisions will often secure for employees payment rates higher than those guaranteed by the FLSA, which simply establishes a minimum wage. *Cf. Powell,* 339 U.S. at 519 & n. 23. When that is the case, employees may well opt to enforce the SCA utilizing its administrative remedy over suing under the FLSA. Moreover, because the wage rate determinations of the Secretary

---

**25.** For a more detailed explanation of the remedial procedures of the SCA, *see Danielsen,* 941

F.2d at 1223 and 29 C.F.R. §§ 1.1–1.9, 4.101–4.156, 4.187–4.191, 7.1–7.18, 8.2–8.9.

play such a crucial role in the SCA's scheme, the regulations delimiting the administrative remedies available under the SCA are directed in large measure toward the Secretary of Labor's determination of prevailing wages. The Secretary's determination of those rates does not implicate the FLSA in any way. Therefore, the administrative remedy chosen by Congress for enforcing the SCA serves purposes that would in no way be affected by permitting employees such as Koren to bring private suits under the FLSA. In sum, cognizant of the Supreme Court's repeated warnings that statutes not in irreconcilable conflict must be given full effect, the Court holds that nothing in the SCA's goals or execution would be undermined by allowing Koren to pursue his private cause of action for back overtime pay under the FLSA.

Following *Powell*, other courts that have addressed the issue have reached the same conclusion. *E.g., Masters v. Maryland Mgmt. Co.*, 493 F.2d 1329, 1332 (4th Cir.1974) (CWHSSA and the SCA "are both mutually supplemental to the FLSA" and "the provisions of all may apply so far as they are not in conflict"); *Lee v. Flightsafety Serv. Corp.*, 20 F.3d 428, 431 (11th Cir.1994) (same—"it is possible that the FLSA may allow a private right of action even though the SCA does not . . . such differences between the two statutes is not a conflict"). As the Court has found no conflict between the FLSA and the SCA, the jurisprudence supports the supplemental application of the two statutes. Defendant's reliance on *Danielsen* to the contrary is misplaced. In, *Danielsen*, 941 F.2d at 1227, the Ninth Circuit refused to permit an employee to bring a private suit under the Racketeer Influenced and Corrupt Organizations Act alleging violations of the SCA. The court believed that permitting the employee to do so would permit an "end-run" around the SCA's remedial provisions; no "plaintiff would pursue his administrative remedies where more direct and expeditious relief is

available in a private suit." *Id.* But the attempted use of the RICO statute in *Danielsen* would have rendered the remedial provisions of the SCA wholly superfluous by simply replacing the SCA's less attractive administrative remedy with the enticing, treble-damages, private remedy provided by the RICO statute *for equivalent violations of the SCA.* In other words, while the underlying violation remained exactly the same—a violation of the SCA—the plaintiff in *Danielsen* was attempting to replace the enforcement provisions of the violated statute with those of the RICO statute. The case at bar presents a completely different scenario: here, the Plaintiff is merely attempting to employ the remedial provisions of a statute, the FLSA, to enforce its own provisions.[26] While the FLSA and the SCA clearly provide overlapping protection, that does not change the fact that Koren is suing under the FLSA for a violation of the FLSA; the plaintiff in *Danielsen* was attempting to sue under the RICO Act for a violation of the SCA.

The Court's conclusion finds further support in the Department of Labor's regulations, which explicitly contradict Defendants' argument. The regulations note that the SCA "does not provide for compensation of covered employees at premium rates for overtime hours of work," 29 C.F.R. § 4.180, but they recognize that "although provision has not been made for insertion in Government contracts of stipulations requiring compliance with the overtime provisions of the [FLSA], contractors and subcontractors performing contracts subject to the [SCA] may be required to compensate their employees working on or in connection with such contracts for overtime work pursuant to the overtime pay standards of the [FLSA]." 29 C.F.R. § 4.181. Having concluded that the SCA does not implicitly repeal the FLSA's private enforcement provisions and having found support for that conclusion in the juris-

---

**26.** The case at bar clearly demonstrates the imprudence of Defendants' argument that the SCA should be read to usurp the FLSA's remedial provisions where the protected employee is working under a federal service contract. Koren has not complained that his rate of pay was improper; he only seeks back pay for overtime he allegedly worked. If the Court were to adopt

Defendants' position, Koren would lose any rights to overtime pay. That was certainly not Congress' intent in enacting the SCA. *Cf. Berry v. Andrews*, 535 F.Supp. 1317, 25 WH Cases 662 (D.Ala.1982) (refusing to find that the SCA constructively repeals FLSA with respect to an alleged violation for which the SCA provided no remedy).

prudence and the regulations, the Court will now address Defendants' arguments with respect to the CWHSSA.[27]

### C. APPLYING THE FAIR LABOR STANDARDS ACT IN CONJUNCTION WITH THE CONTRACT WORK HOURS AND SAFETY STANDARDS ACT

■ Defendants make identical arguments with respect to both the SCA and the CWHSSA, and the Court will apply the same analysis. "The [CWHSSA] assures that laborers and mechanics who work for government contractors are paid overtime for work in excess of ... forty hours a week." *Masters*, 493 F.2d at 1332. Under the CWHSSA, such employees are guaranteed pay for overtime at one and one-half times "the basic rate of pay." 40 U.S.C. § 328(a). The purpose of the CWHSSA, like that of the SCA, is to ensure a forty-hour standard work week for employees working for contractors and who were not already protected by statutes providing a forty-hour work week for "federal employment, for work connected with interstate commerce under the wage-and-hour law, and for work on Federal Supply contracts under the Walsh–Healy Act." S.Rep. No. 87–1722 (1962), *reprinted in* 1962 U.S.C.C.A.N. 2121, 1962 WL 4713 (Leg. Hist.). In other words, it, too, was designed to fill a gap in the protection of employees working for government contractors—the gap left between the FLSA and other contract-related wage-and-hour laws. Both parties agree that, like the SCA, the CWHSSA does not provide employees working under CWHSSA-governed contracts with a private

cause of action. 40 U.S.C. § 330; *Sopena v. Colejon Corp.*, 920 F.Supp. 259, 265 (D.Puerto Rico 1996).[28]

First, the Court must reiterate its belief that Defendant's unsupported statement of Congress' intent in enacting the CWHSSA and SCA is simply unfounded. The primary goal of the wage-and-hour laws is to protect workers. *See Powell*, 339 U.S. at 510, 515–16. While it is true that Congress, in enacting the CWHSSA, wished to simplify the regime governing contractors' and subcontractors' obligations regarding overtime, *see* S.Rep. No. 87–1722 (1962), *reprinted in* 1962 U.S.C.C.A.N. 2121, 1962 WL 4713 (Leg. Hist.), the Court cannot discern from the statute itself, its regulations, or its legislative history any intent to accomplish that goal by impliedly repealing the FLSA's private right of action in favor of administrative remedies provided by the CWHSSA. Moreover, the Court cannot see how the availability of various means of enforcement distort or confuse government contractors' obligations regarding overtime. So even if Defendants correctly stated Congress' intent—to normalize government contractor's wage-and-hour obligations—their position remains unsupported. The Court believes it would be anomalous to find that one law designed to protect a class of workers limited those very worker's rights under a second law designed to ensure the same protections. *Cf. General Dynamics Corp.*, 19 F.3d at 774–75.

Second, Defendant's contention that the administrative remedies set forth by the CWHSSA would be rendered useless if employees such as Koren were permitted to

---

**27.** The parties have not segregated their analysis of whether the CWHSSA and the SCA constructively repeal the FLSA. Notwithstanding the parties' approach, the Court believes separate analysis is warranted for thoroughness and clarity.

**28.** The Court has not found any jurisprudence subjecting the CWHSSA to rigorous analysis under *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) or *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) or other cases in which the Supreme Court established its test(s) for determining whether a statute provides for a private cause of action, or. Given the similarity of the regulatory schemes for enforcing both the SCA and the CWHSSA, *compare* 29 C.F.R. §§ 4.101–4.191 with 29 C.F.R. §§ 5.1–5.32 and *see generally* 29 C.F.R. §§ 6.1–6.57, the Court is relatively certain that such analysis would lead to the conclusion that the CWHSSA would not automatically permit a private cause of action. However, employees protected by the CWHSSA are expressly provided with the right to sue in federal court if the relevant government agency, the Department of the Navy and/or Defense in this case, determines that money withheld from the contractor to remedy underpayment of wages is insufficient to repay aggrieved laborers/mechanics. As Plaintiff has not invoked the CWHSSA in this lawsuit, the question has not been presented, and the Court will not address the issue.

sue under the FLSA is as incorrect as it was when made with respect to the SCA. The CWHSSA, like the SCA, contains no commerce nexus requirements and therefore has the potential to protect employees not protected by the FLSA. Therefore, its administrative enforcement provisions are not rendered useless by permitting employees protected by the CWHSSA to initiate private suits under the FLSA. In light of our mandated reluctance to find an implied repeal and Defendants' failure to point out anything in the statute, its regulations, or its legislative history preventing coexistence with the FLSA, the Court holds that the CWHSSA does not prevent private suits under the FLSA such as Koren's. Jurisprudence from other courts supports this holding. *See Masters*, 493 F.2d at 1332; *Mitchell v. Empire Gas Engineering Co.*, 256 F.2d 781, 784–85; and *Dowd v. Blackstone Cleaners, Inc.*, 306 F.Supp. 1276 (N.D.Tex.1969).

## III. CONCLUSION

The SCA, and the CWHSSA are mutually supplemental to the FLSA. Neither the SCA's nor the CWHSSA's exclusive administrative remedies cannot be reconciled with the private right of action provided by the FLSA. Therefore, summary judgment on Koren's FLSA claim is not appropriate.

IT IS SO ORDERED.